UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                          :

CRYSKNIFE CAPITAL,                     :

                                  :      Case No.  22-cv-7912

                       Plaintiff,      :

                                  :

      - against -                    :      COMPLAINT

                                  :      JURY TRIAL REQUESTED

LIBERTY SPECIALTY MARKETS and CERTAIN    :
UNDERWRITERS AT LLOYD'S, SPECIFICALLY    :
LIBERTY SYNDICATE 4472,          :

                                  :

                    Defendants.    :

                                  :
------------------------------------------------------------------------X

        Plaintiff Crysknife Capital ("Crysknife" or "Plaintiff"), as assignee of KLS Diversified Master Fund, L.P. ("KLS"), by and through its counsel, Ballard Spahr LLP, respectfully alleges as follows against defendants Liberty Specialty Markets ("Liberty") and Certain Underwriters At Lloyd's, Specifically Liberty Syndicate 4472 ("Lloyd's"):

## PRELIMINARY STATEMENT

        1.      Crysknife brings this action to recover the proceeds of Executive Liability Insurance Policy number ELL-P-0497655 (the "Policy") issued by Liberty and Lloyds to Sensei, Inc. ("Sensei") as well as amounts in excess of Policy limits that are due as a result of a bad faith refusal to settle within policy limits to satisfy a final non-appealable judgment entered on behalf of KLS against an insured person.  A copy of the Policy is attached hereto as **Exhibit 1**.[1]  Although Liberty is defined in the Policy as the "Insurer," Lloyds is identified in the Policy as the insurer.

---

[1] All documents attached hereto are represented to be true and correct copies.

On information and belief, Liberty is authorized to act on behalf of Lloyds and is an agent of Lloyds. Accordingly, references herein to Liberty as insurer refer to both Liberty and Lloyds.

2. Sean McDevitt, the one-time CEO and Chairman of the Board of Sensei, is an "Insured Person" under the Policy.

3. KLS brought and maintained an action against McDevitt in federal district court for the Southern District of New York, case number 19-cv-1774 (LJL) (the "Action") and obtained a $5,469,186.79[2] judgment against McDevitt (the "Judgment"), which it assigned to Crysknife. A copy of the Judgment is attached hereto as **Exhibit 2**.

4. Upon being sued by KLS, McDevitt timely notified Liberty of a claim under the Policy, and Liberty agreed to provide McDevitt a defense while reserving all rights under the Policy. McDevitt's notice and Liberty's response (a single email chain) and Liberty's reservation of rights letter are attached hereto as **Exhibits 3 and 4** respectively.

5. In granting KLS summary judgment in the Action, Judge Liman ruled that McDevitt had intentionally withheld contractually-required information from KLS. A copy of Judge Liman's ruling is attached hereto as **Exhibit 5**. While this qualified as a "Wrongful Act" under the Policy, Judge Liman made no findings that McDevitt acted with fraudulent intent or committed a crime.

6. On the basis of Judge Liman's ruling (**Exhibit 5**), Liberty notified McDevitt that two exclusions (Policy, ¶¶ IV(A)(6) and IV(a)(7)) applied to deny him coverage for indemnity for the Judgment. The exclusions upon which Liberty relied were that the "Loss" resulted from a "Claim" made that McDevitt: (1) engaged in a deliberate fraud or a willful criminal act ((A)(6))

---

[2] Post-judgment interest accrues at the statutory rate.

and (2) obtained a financial advantage to which he was not legally entitled ((A)(7)).  Copies of Liberty's declination letters are attached hereto as **Exhibit 6.**

7.       In order for the exclusions to apply, the Policy required that there be a "final adjudication" that the conduct establishing the exclusion occurred.  As detailed below, there was no final adjudication that McDevitt acted with fraudulent intent, intended to commit a crime, or obtained a personal financial benefit to which he was not legally entitled.  To the contrary, the only final adjudication in this case regarding McDevitt's conduct is the Second Circuit's affirmance of Judge Liman's ruling that McDevitt's guaranty was triggered when he caused Sensei to breach a covenant in the Note (defined below).  Neither Judge Liman nor the Second Circuit found that the Loss occurred because of any fraudulent or criminal conduct by McDevitt or conduct seeking to obtain a personal financial benefit to which he was not legally entitled.

8.       McDevitt and Crysknife entered into a settlement agreement (**Exhibit 7** hereto) dated as of April 15, 2022.  The underlying action was withdrawn as settled pursuant to F.R.C.P. Rule 41(a)(1)(A)(ii) by stipulation submitted on or about May 18, 2022, so-ordered and entered by the Court on or about May 20, 2022.

9.       Judge Liman's ruling was appealed by McDevitt.  By Summary Order entered July 13, 2022 (**Exhibit 8** hereto), the Second Circuit unanimously affirmed Judge Liman's ruling on one ground—that he caused Sensei to fail to timely file tax returns and pay taxes.

10.      The Second Circuit made no finding with regard to McDevitt's intent, nor did it find that he obtained a personal benefit to which he was not entitled.  Accordingly, Liberty has no basis for declining to provide coverage to McDevitt for indemnity for the Action.

11.      Crysknife has standing to pursue this action because McDevitt assigned his rights under the Policy to Crysknife.  Moreover, as a judgment creditor of McDevitt, Crysknife

has rights to the Policy proceeds and has demanded that Liberty honor its insurance commitment to McDevitt up to the currently available limits of the Policy.  Liberty refused the demand.

12.     Crysknife thus petitions this Court to order Liberty to turn over to it funds sufficient to satisfy the entire Judgment, even beyond the remaining limits of the Policy.

13.     In addition, after judgment was entered by Judge Liman, KLS began enforcement proceedings against McDevitt in the state of Texas, the state of his residence.  At the time of such enforcement proceedings, McDevitt claimed to have no attachable assets to satisfy the Judgment, and Liberty had declined coverage—citing the exclusions described above. According to coverage correspondence that was provided to KLS, as of April 28, 2021, there was $4,640,000 remaining within the limits of the Policy.  That number reduced to, at most, approximately $4,440,000 upon the most recent payment of McDevitt's legal fees.

14.     In order to allow McDevitt to avoid the ruinous financial consequences of the Judgment, Crysknife offered to settle all liability against McDevitt in exchange for the proceeds remaining on the Policy.  Liberty unreasonably refused to accept such offer, thus exposing its Insured Person to personal liability in excess of policy limits.

15.     After a final judgment was entered by the Second Circuit Court of Appeals on narrow grounds that failed to satisfy either cited exclusion, Crysknife again offered to settle all liability against McDevitt in exchange for the proceeds remaining on the Policy.  Again, Liberty unreasonably refused to accept such offer, thus exposing its Insured Person to personal liability in excess of policy limits.

16.     Such conduct by Liberty constitutes an unreasonable refusal to settle and requires that Liberty itself, rather than the Insured Person, be responsible for the amount in excess of policy limits for which the Insured is now responsible.

## PARTIES

17. Crysknife is a limited liability company organized under the laws of the state of New York.

18. As set forth on its website, Liberty Specialty Markets is a trading name for various members of the Liberty Mutual Insurance Group. According to the Policy (*see* **Exhibit 1**, page 3 of 38), the Insurer is "Certain Underwriters at Lloyd's, London Liberty Syndicate at Lloyds LIB 4472." Correspondence from Liberty's third-party claims administrator (attached hereto as **Exhibit 4**) also identifies the Insurer as "Certain Underwriters at Lloyd's, London Syndicate at Lloyds LIB 4472" and shortens that name to "Liberty." The Liberty Specialty Markets website notes that Liberty Managing Agency Limited "acts as a Lloyd's Managing Agent for Liberty Syndicate 4472." The address given in the Policy for Liberty Specialty Markets (shortened form: "Insurer") is: Level 21, 20, Fenchurch Street, London EC3M 3AW. The Liberty Specialty Markets website identifies the following entities as being located at that address: Liberty Specialty Markets Europe S.à r.l. (London branch) ("LSME"); Liberty Specialty Markets Europe Two S.à r.l. (London branch) ("LSME2"); and Liberty Mutual Insurance Europe SE (London branch). The Liberty Specialty Markets website states that both LSME and LSME2 are "licensed by the Luxembourg Minister of Finance as an insurance and reinsurance agency with authority to enter into contracts of insurance and reinsurance on behalf of Liberty Mutual Insurance Europe SE, Lloyd's Insurance Company S.A. and Syndicate 4472 which is managed by Liberty Managing Agency Limited." Crysknife reserves the right to amend this complaint to add or substitute one or more defendants if necessary.

19. Defendant Certain Underwriters at Lloyd's London, specifically Syndicate 4472, is an insurance syndicate for whom Liberty acts as an authorized agent. Lloyds is a citizen

of the United Kingdom, with principal places of business outside this District, operating in the Lloyd's London market that insure risks in return for payment of premium.

20.     Nonparty KLS is a Cayman Island limited partnership currently in voluntary liquidation.  As part of winding down, KLS assigned its judgment against McDevitt to Crysknife.

21.     Nonparty McDevitt is an individual believed to be residing in Texas.  He is an "Insured Person" under the Policy and has assigned his interest in the Policy to Crysknife.  A copy of the assignment is attached hereto as **Exhibit 9**.

22.     Nonparty CoverWallet acted as insurance broker for Sensei and, in that capacity, negotiated coverage and other insurance issues with Liberty.  CoverWallet is located at 1410 Broadway 8th Floor, New York, NY 10018.  On CoverWallet's web site, it identifies Liberty Mutual as one of its "insurance partners."

23.     Upon information and belief, Nonparty Risk Placement Services ("RPS") represented Liberty and Lloyd's in negotiating the Policy.  On its web site, RPS boasts that "As the nation's largest MGA/Lloyd's coverholder, we are able to offer local expertise with a national reach with exceptional service."   RPS has locations on Staten Island and in Uniondale and Melville, New York.

24.     Nonparty Wilson Elser Moskowitz Edelman and Dicker serves as third-party claims administrator for Liberty and, in that capacity, informed McDevitt of Liberty's declination of coverage for indemnity in the Action.  Coverage correspondence from Wilson Elser is included in the correspondence attached hereto in **Exhibit 6**.  Wilson Elser has numerous locations, but the coverage correspondence was sent from its New York City office located at 150 East 42nd Street, New York, NY 10017, by Thomas W. Wilson, Jr. and Scott R. Schaffer, both of whom are partners resident in that office; and copied to Eric Kaufer, Michael Kar, attorneys in that

office, and Michelle Arbitrio, Christopher J. Seusing, and Sameer P. Ponkshe, all with Wood Smith Henning & Berman LLP (McDevitt's counsel), resident in offices of Wood Smith located in New York.  Wilson Elser serves also as counsel to Liberty in this action.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over Liberty pursuant to CPLR § § 301 and 302 because, among other reasons, Liberty and Sensei negotiated the Policy through their agents in New York; the Policy was administered in New York through a third-party claims administrator located in New York; the underlying litigation giving rise to defense costs and a judgment took place in New York; and the declination of coverage at issue in this action was made in New York.

26.     Venue is proper in this Court pursuant to CPLR § 503(a) because Plaintiff is a New York LLC and the activity identified immediately above took place in New York, New York.  Moreover, Plaintiff is the assignee of KLS, a Cayman limited partnership with a principal place of business in New York, New York.

## FACTS

A.     **The Underlying Action**

i.     **The Transaction**

27.     McDevitt was an officer and director of Sensei, a company that marketed software and technology products and services for use in the healthcare industry, including to clients located in the State of New York.

28.     As of late 2016, Sensei was a start-up that was losing money and running out of cash.  It had no clients or revenue sources and faced six-figure obligations for accounts payable, payroll, royalty payments, legal fees, and several other payables.  At the time of the KLS

loan, Sensei also had outstanding federal payroll tax obligation of about $300,000 (not including state taxes).

29.     In early 2017, McDevitt, acting on behalf of Sensei, reached a deal with KLS whereby KLS purchased a $3.33 million note from Sensei to be re-paid in full by January 9, 2019.  As a condition of the loan, KLS demanded and received a conditional personal repayment guaranty from McDevitt.

### ii.     The Guaranty and Other Transaction Documents

30.     The transaction closed on January 9, 2017.  It was implemented through three primary documents: a Secured Convertible Promissory Note Purchase Agreement (the "Purchase Agreement"); a $3.33 million convertible promissory note, with a 4% annual coupon and a maturity date of two years from the date of execution (the "Note"); and a conditional guaranty of payment (the "Guaranty").  Copies of the Note, the Purchase Agreement, and the Guaranty are attached hereto as **Exhibits 10, 11, and 12**, respectively.

31.     The Guaranty was termed "conditional" because it was triggered only by certain recourse events.  Judge Liman found that two recourse events occurred to trigger the Guaranty.  The Second Circuit affirmed one and stated that it was unnecessary to address the other recourse event found by Judge Liman.

32.     The Second Circuit affirmed Judge Liman's finding regarding the following Recourse Event:

> (c)     any material breach of the material terms of the Note (including, without limitation, with respect to restrictions on indebtedness, liens, dispositions of assets, distributions in respect of capital stock, payments of subordinated indebtedness, intellectual property, or affiliate transactions) directly or indirectly caused by Guarantor ["Recourse Event (c)"] . . . .

33.     Paragraph 5 of the Note, entitled "Affirmative Covenants" required that Sensei shall do all of the following:

> (b)     Financial Statements, Reports, Certificates. Provide Holder [KLS] with the following:
>
>> (vi)     *Legal Action Notice.* A prompt report of any legal actions pending or threatened in writing against Company; . . .
>
> (c)     Taxes; Pensions. Timely file all required tax returns and reports and timely pay all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Company.

**B.     <u>Facts Relating to the Recourse Events</u>**

**i.     Porter Wright**

34.     On March 14, 2014, Sensei engaged the law firm Porter Wright Morris & Arthur LLP ("Porter Wright") to represent it in connection with a private placement of securities. Previously, in 2013, Sensei and McDevitt orally retained Porter Wright to represent it and him in connection with additional matters.   Porter Wright performed services pursuant to these agreements prior to the KLS investment.

35.     McDevitt, who controlled Sensei, caused Sensei to fail to pay Porter Wright. As a result, prior to the KLS investment, Sensei and McDevitt owed Porter Wright $125,431.97 for legal fees and services.

36.     By email dated November 25, 2015 (**Exhibit 13** hereto), Porter Wright threatened a lawsuit against Sensei with respect to those bills.  The Porter Wright partner who authored the email told McDevitt, "My firm wants to sue you personally and Sensei for payment. I've held them off thinking that is not the best approach for any of us. But if you don't communicate with me, I don't think there is any other choice. . . . If you do not respond to this email within the next 7 days, that will say it all."

37.     Prior to the closing of the Transaction on January 9, 2017, McDevitt failed to inform KLS of this threatened litigation.

38.     On or about April 26, 2017, Porter Wright commenced an action (Filing # 55622117) in County Court for Collier County Florida seeking payment of $125,431.97.  McDevitt thereafter failed to disclose the lawsuit to KLS.

**ii.     The Finder, Jonathan Schwartz**

39.     In 2015, Sensei was seeking investors.  It turned to an individual named Jonathan Schwartz for professional assistance.  By agreement made as of November 6, 2015, Sensei entered into a "Compensation, Non-Circumvention, and Non-Disclosure Agreement" with Schwartz (the "Finder's Agreement").

40.     Pursuant to the Finder's Agreement, should an investor identified by Schwartz invest in the Sensei, Schwartz was to be paid a finder's fee equal to seven percent of that investment.

41.     According to Schwartz, he identified an investor who made a $2 million investment in Sensei on or about January 10, 2017.  As a result, Schwartz demanded payment of $140,000 in satisfaction of his seven percent commission.  He emailed McDevitt seeking payment, but McDevitt never responded.

42.     Thereafter, on or about June 2, 2017, Schwartz sued Sensei in federal court for the Southern District of New York (case number 17-cv-04124).

43.     McDevitt failed to notify KLS of the filing of the lawsuit, and KLS learned about the lawsuit only after Schwartz obtained a default judgment against Sensei and sought and obtained a restraint of Sensei's bank account.

### iii.     Sensei's Taxes

44.     On May 17, 2018, KLS removed McDevitt as CEO.  Prior to that time, McDevitt had not informed KLS of the status of Sensei's tax payments.  In fact, there were arrears owing to the federal government and the governments of Georgia, California and Connecticut that arose after the closing of the Transaction.  In conversation with KLS, McDevitt admitted that the failure to retire outstanding and accruing tax liabilities was his fault and promised to pay them himself, but he never did pay the taxes in full.

*    *    *    *    *

45.     Sensei's failure to report Porter Wright's pre-transaction threats of litigation and Porter Wright's and Schwartz's post-transaction litigations breached Note covenant 5(b).  Its failure to pay federal and state taxes as they accrued breached Note covenant 5(c).  McDevitt caused those breaches, and thus recourse event 1(c) occurred.  In finding the occurrence, neither the U.S. District Court nor the Second Circuit needed to find, nor did they find, that McDevitt acted with any particular intent.

## THE LOSS IS COVERED UNDER THE POLICY

### A.     The Policy

46.     Liberty's June 24, 2019 reservation of rights letter ("ROR Letter"; **Exhibit 4** hereto), signed on behalf of Liberty by its then third party claims administrator, Lancer Claims Service, sets forth Liberty's coverage position and the rights it reserved.  In it, Liberty acknowledged that, absent an applicable exclusion, the conduct alleged by KLS in its suit against McDevitt, an insured person under the policy, falls into insuring clause B, quoted in the ROR Letter as follows:

1.     INSURING CLAUSES

B.     Directors and Officers Liability (Reimbursement)

The Insurer shall pay on behalf of the Company Loss for which the Company grants indemnification to the Insured Persons, as permitted or required by law, and which the Insured Persons have become legally obligated to pay by reason of any Claim first made against the Insured Persons during the Policy Period or the Discovery Period, if exercised, for any Wrongful Acts by the Insured Persons.

47.     A "Wrongful Act" is defined as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the Insured Persons in their capacity as such."  Policy (**Exhibit 1** hereto), Section III, at 20 of 38.  KLS' "Claim" against McDevitt for a "Wrongful Act" alleged he withheld from KLS information about (a) Porter Wright's threatened lawsuit against Sensei, (b) Porter Wright's filed lawsuit against Sensei and McDevitt, (c) Jonathan Schwartz's filed lawsuit against McDevitt and Sensei, and (d) Sensei's post-transaction failure to pay taxes as they accrued. McDevitt then incurred a "Loss" as defined in the Policy, because he became obligated to pay a judgment to KLS "by reason of" his Wrongful Act.

48.     In its ROR Letter, Liberty reserved the right to later invoke three exclusions to coverage should they apply.  As quoted in the ROR Letter, Liberty reserved the right to invoke the following exclusions:[3]

IV.     EXCLUSIONS

A.     The Insurer shall not be liable under any insuring Clause in this Coverage Part for Loss on account of any Claim made against any Insured:

6.     based upon, arising out of, or attributable to any deliberately fraudulent or criminal act or omission or any willful

---

[3] Liberty pointed also to exclusion B (liability arising out of breach of contract) but acknowledged that that exclusion applies only to insuring clause C, providing coverage in the event of a claim against Sensei.  Insuring clause C has no relevance to this Complaint and thus neither does exclusion B.

violation of law by such Insured if a final adjudication in such Claim establishes that such act, omission or violation occurred.

7.      based upon. arising out of, or attributable to such Insured gaining in fact any profit, remuneration or financial advantage to which such insured was not legally entitled if a final adjudication in such Claim established that such profit, remuneration or financial advantage occurred:

8.      brought or maintained by or on behalf of the Company or an Outside Entity[4] or any Insured Person, except this exclusion shall not apply to:

* * *

f.      a Claim brought or maintained by or on behalf' of a bankruptcy or insolvency trustee, examiner, receiver. creditors committee or similar official or committee for the Company or an Outside Entity, any assignee of such trustee, examiner, receiver, committee or similar official or committee, or any Claim while the Company is operating as a debtor-in-possession;

49.      In a so-called "First Supplemental Coverage Letter," dated May 4, 2020, successor third-party claims administrator Wilson Elser added two additional bases for denying coverage.  A copy of the First Supplemental Coverage Letter is attached hereto as **Exhibit 6**. Therein, Wilson Elser, on behalf of Liberty, notes on page 2 of 4, "LSM [Liberty] acknowledges that the Claimant's alleged damages include taxes. Respectfully, as taxes are not included in the above definition of Loss, LSM reserves its rights accordingly."

50.      KLS's alleged damages did <u>not</u> include taxes, and Judge Liman did not include any taxes in the damages calculation.  *See* **Exhibit 2** hereto.

51.      Wilson Elser also noted, at page 3 of 4, that

LSM acknowledges that the Wrongful Acts alleged by Claimant KLS have a common nexus with, and are related to, the Wrongful

---

[4] "Outside Entity" is defined in the Policy (par. III, at 20 of 38) as "1. any Non-Profit Entity, and 2. any other entity, if such coverage is specifically granted by endorsement to this Policy."  KLS is not an Outside Entity as so defined.

Acts alleged by Jonathan Schwartz in the litigation filed in the
United States District Court for the Southern District of New York:
Jonathan Schwartz v. Sensei, LLC d/b/a Kaviva, Sean Daniel
McDevitt, Alexander Eric Furer, and Odeon Capital Group, LLC;
Civil Action No. 1:17-cv-4124.1 Therefore, on account of such
Interrelated Wrongful Acts the Schwartz action and the instant KLS
action together constitute one single Claim under the Policy.

52.     The comment is curious (and incorrect), given that the only "nexus"
between the Schwartz suit and the KLS suit is that the KLS suit is based, in part, on McDevitt's
failure to disclose the Schwartz suit.  The "wrongful act" alleged in the Schwartz suit is the alleged
failure to pay him a finder's fee, which is entirely different conduct from that alleged in KLS's
suit--McDevitt's failure to disclose, among other things, the existence of the Schwartz suit.

53.     By so-called Second Supplemental Coverage Letter dated April 28, 2021
(**Exhibit 6** hereto), Wilson Elser once again referred to Exclusions 6 and 7, noting

In his Order, Judge Liman determined that both Recourse Events (a)
and (c) above were triggered by the failure of McDevitt to disclose
threatened and/or pending litigation by Porter Wright. Judge Liman
found that such failure to disclose this litigation was material and a
"willful and intentional misrepresentation or omission."
Accordingly, in the event of a final adjudication of such wrongful
conduct by Insured Person McDevitt, Exclusion IV.A.6 would
thereby [be] applicable and LSM would respectfully deny coverage
for all Loss, including the Judgment and Defense Costs, in this
litigated Claim. In addition, with respect to Judge Liman's
observation that the Conditional Guaranty provided that Insured
Person McDevitt would "obtain substantial direct and indirect
benefits from the issuance of the Note," LSM continues to reserve
its right to also deny coverage for all Loss, including the Judgment
and Defense Costs, under Exclusion IV.A.7.

54.     We refer herein to the ROR Letter (and its identical twin) and the two
supplemental coverage letters collectively as "Coverage Correspondence."

**B.**     **Judge Liman Made No Finding of Fraud or Criminality**

55.     As noted above (¶ 27), Judge Liman found that Recourse Events had
occurred under Guaranty Paragraphs 1(a) and 1(c).  The Second Circuit affirmed the latter and

declined to reach the former as unnecessary.  Neither Judge Liman nor the Second Circuit made

any finding of fraud or criminal conduct or willful violations of law.  Indeed, other than as set forth

in quotations from the Guaranty or other transactional documents, the words "fraud" and "crime"

or any variation thereon <u>do not appear at all in Judge Liman's Opinion and Order or the Second</u>

<u>Circuit's Summary Order</u>.

56.     McDevitt offered myriad reasons why he believed he was not required to

disclose Porter Wright's threatened litigation, Porter Wright's filed litigation, and Schwartz's filed

litigation.  Moreover, he offered excuses for his failure to keep Sensei current on taxes.  Judge

Liman disagreed but, significantly, did not rule that McDevitt engaged in a "deliberately fraudulent

or criminal act or omission or any willful violation of law."

57.     Recourse Event (c) does not contemplate, much less require, a finding of

fraud or criminality.  Rather, the necessary showing is that McDevitt caused a material breach of

a material term of the Note.  His intent in doing so was not at issue and thus not addressed.

58.     Thus, neither Judge Liman's findings nor the Second Circuit's affirmance

of them constitute a final adjudication satisfying Exclusion (A)(6).

**C.     <u>Judge Liman Made No Finding that the Loss Occurred because McDevitt</u>**
**<u>Gained a Financial Benefit to which He Was Not Entitled</u>**

59.     Judge Liman likewise made no finding that could qualify as an

"adjudication" under Exclusion (A)(7).  Liberty managed to find some words in Judge Liman's

61-page that related to McDevitt's benefitting from the transaction: Judge Liman's note that the

Guaranty recites that "McDevitt would 'obtain substantial direct and indirect benefits from the

issuance of the Note."  However, Judge Liman made no adjudication that the Loss resulted from

McDevitt's "gain[ing] . . . in fact any profit, remuneration or financial advantage to which [he] . .

. was not legally entitled."  In fact, the Guaranty that was McDevitt triggered made him  personally

liable for a financial benefit (the loan) that was conferred on Sensei—the very opposite of the conduct contemplated by the exclusion. Thus Exclusion (A)(7) does not apply.

### D. None of the Additional, Possible Exclusions Alluded to by Liberty Apply

60. The various additional possible bases to deny coverage alluded to by Liberty from time to time are inapposite. The judgment does not seek recovery for taxes. The KLS suit and the Schwartz suit (throughout its various iterations) are unrelated except to the extent that a failure to disclose the Schwartz suit was a Recourse Event. This is not a suit by an Outside Entity as defined in the Policy. Although the Action does seek recovery for breach of contract, claims for breach of contract are excluded only in an action against the Company.

61. By letter addressed to McDevitt dated September 14, 2022, Liberty took a third bite of the apple, now claiming as additional bases for denial of coverage McDevitt's failure to obtain Liberty's approval of the settlement, including McDevitt's assignment of rights under the Policy. A copy of the September 14 letter is attached hereto as **Exhibit 19**.

62. Liberty's new coverage positions fail to repair the infirmities in its previous coverage positions and are rife with new deficiencies. Specifically, Liberty:

> (a) continues to misconstrue Judge Liman's reference to intentional conduct as a reference to fraud;

> (b) mistreats Judge Liman's ruling as a final adjudication, ignores that the Second Circuit's Summary Order is the final adjudication, and fails entirely to address the Second Circuit's ruling;

> (c) ignores that the Second Circuit did not find that the Loss resulted from any conduct by McDevitt that constituted fraud, criminal behavior, or an attempt to obtain a financial advantage to which he was not entitled;

> (d) claims that McDevitt's agreement to the settlement somehow vitiates the Policy even though (i) the Policy language does not support that misanalysis and (ii) Liberty had previously and wrongfully denied coverage; and

> (e) claims that the anti-assignment provision in the Policy prohibits an unapproved assignment of rights under the Policy after the wrongful act, even

though the case law is clear that the provision affects only pre-claim assignments, essentially substituting a new insured (and a new risk) for the one underwritten by the insurer.

63.     Liberty's new (and supposedly final) coverage position is, like its prior positions, inaccurate and unavailing.

## CRYSKNIFE HAS THE RIGHT TO RECOVER FROM LIBERTY EITHER AS MCDEVITT'S ASSIGNEE OR AS McDEVITT'S JUDGMENT CREDITOR

### A.      Assignee

64.     In connection with winding down, KLS assigned its judgment against McDevitt and all related rights to Crysknife.  McDevitt then assigned whatever rights he had under the policy to Crysknife.  As McDevitt's assignee, Crysknife stands in McDevitt's shoes and has all of his rights under the Policy.

65.     As set forth above, the Policy covers the Loss suffered herein, and no exclusions apply to relieve Liberty of its obligation to cover indemnity.  Crysknife and McDevitt have satisfied any conditions precedent to coverage.  Thus Crysknife is entitled to recover under the Policy as McDevitt's assignee.

### B.      CPLR Article 52

66.     CPLR 5225(b) provides in relevant part:

b)      Property not in the possession of judgment debtor.  Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, . . .  where it is shown that the judgment debtor is entitled to the possession of such property . . . , the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.  Costs of the proceeding shall not be awarded against a person who did not dispute the judgment debtor's interest or right to possession.

67.     As assignee of KLS, Crysknife is a judgment creditor as to McDevitt.

68.     For the purposes of determining priority of a judgment creditor, "an 'order' should be deemed to include a 'judgment' as well, a judgment being what the judgment creditor gets who brings a special proceeding against a garnishee under CPLR 5225(b) or 5227, two of the lien-giving devices of Article 52."  Siegel, N.Y. Prac. § 519 (6th ed.).  *See also id.* § 510 ("An order under CPLR 5225(a), which should be deemed to include a judgment under CPLR 5225(b) or 5227, gives the judgment creditor who gets it a lien on the subject personal property as of the moment of entry of the judgment or order.").

69.     CPLR § 5227 states in pertinent part:

> Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment;  or it may direct that a judgment be entered against such person in favor of the judgment creditor.  Costs of the proceeding shall not be awarded against a person who did not dispute the indebtedness.

70.     "In New York, . . . a party seeking to enforce a judgment 'stand[s] in the shoes of the judgment debtor in relation to any debt owed him or a property interest he may own.'" *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Dumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002).

71.     In ruling on a <u>different</u> issue (whether Liberty's undertaking to pay defense costs is property in which McDevitt has a direct interest), Judge Liman noted:

> "The legal 'interest' owned by the judgment debtor in the property held by the third party 'must be . . . a direct interest in the property itself which . . . is leviable and not an indirect interest.'" *Preferred Display, Inc. v. CVS Pharmacy, Inc.*, 923 F. Supp. 2d 505, 509 (S.D.N.Y. 2013) (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 391 (S.D.N.Y. 2003)). In New York, "indebtedness is not

> attachable unless it is absolutely payable at present or in the future to the judgment debtor . . . and not dependable on any contingency." *Sheehy v. Madison Square Garden Corp.*, 193 N.E. 633, 633 (1934). "The judgment creditor stands in the shoes of the judgment debtor, and if a given property, asset, interest, or deposit is unavailable to the debtor, it is unavailable to the creditor. We can call this the stand-in-the-shoes rule, and it can answer many questions." Seigel, N.Y. Practice § 488.

Opinion and Order, entered January 25, 2022 (attached as **Exhibit 14** hereto).

72.     Judge Liman ruled that moneys payable to McDevitt's lawyers was not property in which McDevitt had a direct interest and the obligation to make those payments is not a debt to McDevitt.[5]  Judge Liman based his finding on the agreement between Wood Smith, McDevitt's counsel, and Liberty, making Liberty's obligation directly to Wood Smith and McDevitt an intended third party beneficiary thereto.

73.     Here, under the policy, a "Loss" "means the amount which the Insureds become legally obligated to pay on account of Claims made against them for Wrongful Acts. . . ." Policy, at 19 of 38.  The pertinent insuring agreement states:

> The Insurer shall pay on behalf of the Insured Persons Loss for which the Insured Persons are not indemnified by the Company and which the Insured Persons become legally obligated to pay by reason of any Claim first made against the Insured Persons during the Policy Period or the Discovery Period, if exercised, for any Wrongful Acts by the Insured Persons.

*Id.* at 17 or 38.

---

[5] In analyzing the issue of the viability of a restraining notice served on Liberty with regard to payments of McDevitt's legal fees, Judge Liman relied heavily on a litany of four cases, including *XL Specialty Insurance Company v. Lakian*, 243 F. Supp. 3d 434, 436 (S.D.N.Y. 2017)(Wood, J.), a "stand in the shoes of the judgment debtor" case.  There, the Court denied the judgement creditor's application because the judgment debtor had no rights to the funds in question.  It is important to note, however, that Judge Wood found that the judgment debtor had no rights to the funds and that XL owed no debt to the judgment debtor because there was no coverage under the policy at issue.  *Id.*, at 447-48.  As set forth above, the Policy here does cover the Loss.

74.     In this regard, there is no agreement between KLS (or Crysknife) and Liberty.  The only agreement is between Liberty and the Insured Person, McDevitt.  McDevitt is legally obligated to pay the judgment, and Liberty has agreed to pay on his behalf.

75.     This case is like *AmTrust N. Am., Inc. v. Preferred Contractors Ins. Co. Risk Retention Grp., LLC*, No. 16-mc-0340 (CM), 2016 U.S. Dist. LEXIS 145705 (S.D.N.Y. Oct. 18, 2016).  There, AmTrust obtained a judgment against an entity known as Pac Re, which had a reinsurance arrangement with PCIC, the defendant in this action on the restraint.  Thus, pursuant to a "Casualty Quota Share Reinsurance Agreement between PCIC and Pac Re . . . . PCIC will 'retain 100 percent (100%) of the reinsurance premiums due to [Pac Re] pursuant to this Agreement on a funds withheld basis.' . . . It further provides that PCIC will 'establish on its books as a liability to [Pac Re] a funds withheld account with respect to this Agreement ....' *Id.* at *3-4.

76.     The Court held that

> it is clear that PCIC holds the Account as a 'liability' to Pac Re. . . .
> PCIC has acknowledged that the Account contains premium
> payments that PCIC would 'ordinarily' pay to Pac Re as part of their
> reinsurance agreement. Whatever reasons why the account exists,
> and whatever restrictions the 2008 Agreement places on Pac Re's
> ability to withdraw or control the Account's funds, they do not
> change the fact that Pac Re has a direct ownership interest in the
> money in the Account.

*Id.* at *17.  The same is true here.  LSM has an obligation to Defendant that gives rise to a liability for Liberty.

77.     Through this action, Crysknife respectfully requests this Court to find that Liberty's denial of coverage for the Action was wrongful and a breach of the Policy and order that Liberty has insured the Claim and that the Loss is covered.  In that event, Liberty would hold funds that it is obligated to pay out pursuant to the Policy.

78.     Whether Crysknife's interest in the insurance proceeds arises by virtue of its status as a judgment creditor of McDevitt or the assignee of McDevitt's rights under the Policy, if this Court agrees that Liberty has unlawfully denied coverage and orders it to acknowledge coverage, Liberty has no rights to the funds and Crysknife has every right to them.

### C.     Liberty Acted in Bad Faith and thus Is Liable for the Entire Judgment

#### i.     Liberty Failed to Settle Within Policy Limits

79.     The Policy does not have a choice of law provision.  Sensei, the Named Insured, is a Delaware Corporation and thus Delaware law would apply to determine whether Liberty acted in bad faith.

80.     A cause of action for bad faith against the insurer can accrue "when the insurer refuses to honor its obligations under the policy," including failing to settle claims against the insured within policy limits.  *See Enrique v. State Farm Mut. Auto. Ins. Co.,* 142 A.3d 506, 511 (Del. 2016); *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1275 (Del. 2016).  It is axiomatic that the covenant of good faith and fair dealing is implied in every contract. *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 449 (Del. 1996).  In the insurance context, the implied covenant includes a duty to "settle [claims] within policy limits where recovery in excess of those limits is substantially likely."  *Connelly*, 135 A.3d at 1275.  The "basis of the insurer's duty to settle within policy limits is the insurer's exclusive control over settlement negotiations and defense of litigation, which results in a conflict of interest between the insurer and the insured."  *Id.* (quotations omitted).  Thus, an insurer is liable if it "fail[s] to use good faith or due care in settlement negotiations with plaintiff prior to trial." *McNally v. Nationwide Ins. Co.*, 815 F.2d 254, 259 (3d Cir. 1987) (quoting *Stilwell v. Parsons*, 145 A.2d 397, 402 (Del.1958)); *see also Gruwell v. Allstate Ins. Co.*, 988 A.2d 945, 946 (Del. Super. Ct. 2009) (holding insurer can be liable for bad-faith failure to settle).

81.     When the insurer does not act in good faith in settlement negotiations and a judgment in excess of the insured is reached, the insurer will be liable for damages, including pre-judgment and post-judgment interest, punitive damages, and costs ensued after an insurer's bad-faith refusal to settle.  *See Connelly*, 135 A.3d at 1280; *Gruwell*, 988 A.2d at 947.

82.     As noted above, Crysknife and McDevitt entered into a settlement agreement pursuant to which Crysknife agreed to accept 90% of the $5,469,186.79 Judgment – or $4,926,137.65 – in satisfaction of the Judgment.  Payment of the settlement amount consisted of assignment by McDevitt of his rights under the Policy.  Crysknife agreed to take all steps reasonably necessary to recover any insurance proceeds and to first apply any policy proceeds to payment of the settlement amount.  McDevitt would remain liable for any portion of the Judgment remained unsatisfied thereafter.

83.     The Policy limit is $5 million, and Crysknife was aware that that amount had been eroded.  Thus, Crysknife believed that there remained under the Policy inadequate amounts to satisfy the settlement amount, much less the full Judgment.  By letter dated June 17, 2022 (**Exhibit 15** hereto), Crysknife, through counsel, offered to accept the Insurers' substantially depleted but remaining policy limits in satisfaction of its claims.  Crysknife made the offer to McDevitt's counsel and asked that counsel so inform Liberty.

84.     By email dated June 27, 2022, McDevitt's counsel informed Crysknife's counsel that Liberty declined the settlement demand.  When Liberty seemed equivocal with regard to its declination, Crysknife offered to keep the settlement demand open, but Liberty did not respond to that entreaty.

85.     After the Second Circuit affirmed Judge Liman's decision, establishing the "final adjudication" for purposes of the Policy exclusions, Liberty, acting through its counsel (and

third party administrator, Wilson Elser), requested that Crysknife's settlement demand remain open and available until August 15, 2022.  Crysknife agreed.  That exchange of correspondence is attached hereto as **Exhibit 16.**

86.     Nonetheless, Liberty declined Crysknife's settlement offer.

87.     Because Crysknife twice offered to settle with Liberty for the policy limits, and Liberty unreasonably declined to accept that offer, Crysknife respectfully requests that this Court hold Liberty liable for the full amount of the judgment, rather than just the remaining policy limits.  McDevitt should not face ruinous financial liability because Liberty refused to settle after an judgment in excess of policy limits had already been entered against the Insured.

88.     Accordingly, Crysknife respectfully requests that the Court order Liberty to pay Crysknife as McDevitt's assignee or turn over to Crysknife pursuant to CPLR Article 52 the full amount of the Judgment.

89.     During the course of the McDevitt litigation, McDevitt refused to supply the Coverage Correspondence, taking the position that the Coverage Correspondence with Liberty's counsel was privileged and irrelevant, although none of it appears on any privilege log and none was identified as withheld as irrelevant.  Facing the prospect of incarceration for contempt for failure to produce the Coverage Correspondence (among other things) in the Texas enforcement litigation, McDevitt finally produced it.

90.     Wilson Elser also refused to produce the Coverage Correspondence to KLS and Sensei.  Sensei is, of course, the Insured.  Nonetheless, when Sensei asked for copies of Coverage Correspondence regarding its policy of insurance, Wilson Elser refused and reminded Sensei that it risked losing coverage if it cooperated with KLS.  A copy of Wilson Elser's letter is attached hereto as **Exhibit 17**.  After Sensei assigned its rights under the Policy to KLS and KLS

sought the coverage correspondence, Wilson Elser, once again acting on behalf of Liberty, refused, taking the remarkable position that correspondence between Liberty and McDevitt regarding (and denying) coverage is protected by the attorney client privilege.

91.     Recently, Wilson Elser continued to obfuscate when Crysknife, as McDevitt's assignee, requested to know the limits left on the Policy.  Although Crysknife's right to the information is clear and obvious, and the information is easily obtained, Wilson Elser first claimed to be "considering" the request for the first two weeks after it was made, then claimed not to be able to respond because one of the Wilson Elser lawyers and one of the Liberty personnel were on vacation, and, finally, took the position that it was still considering the request (a month after it was made) and still had not decided whether to supply the information.  A copy of the exchange of emails is attached hereto as **Exhibit 18.**

92.     Liberty's refusal to provide the coverage correspondence severely hampered KLS's (and later Crysknife's) ability to negotiate with McDevitt and with Liberty. Liberty's refusal to inform Crysknife of remaining limits further restrained settlement discussions. These refusals to acquit Liberty's responsibilities under the Policy are further evidence of Liberty's bad faith.

### COUNT I
### (Breach of Contract)

93.     All of the foregoing paragraphs are incorporated herein by reference.

94.     By failing to pay Crysknife's claim, Liberty has breached the terms of the Policy.

95.     Because it has not received the proceeds owing to it under the Policy, Crysknife has been damaged in the amount of $5,469,186.79 as a result of Liberty's breach of the Policy.

**WHEREFORE**, Plaintiff Crysknife respectfully requests that this Court:

A.      Enter judgment in favor of Plaintiff and against Defendants as to Count I of the Complaint in the amount of $5,469,186.79, plus court costs and post-judgment interest; and

B.      Grant Plaintiff such other relief as may be appropriate.

## COUNT II
### (Declaratory Judgment)

96.      All of the foregoing paragraphs are incorporated herein by reference.

97.      There is a present justiciable controversy between Crysknife and Liberty concerning Crysknife's recovery under the Policy.

**WHEREFORE**, with regard to Count II of the Complaint Plaintiff Crysknife respectfully requests that this Court:

A.      Determine and adjudicate the rights and liabilities of Plaintiff and Defendants under the Policy with regard to Plaintiff's claim and in so doing order Defendants to pay Plaintiff's claim in full;

B.      Award Plaintiff costs incurred in connection with this action; and

C.      Grant Plaintiff such other relief as may be appropriate.

## COUNT III
### (Turnover)

98.      All of the foregoing paragraphs are incorporated herein by reference.

99.      By failing to pay Crysknife's claim, Liberty has breached the terms of the Policy.

100.      Because it has not received the proceeds owing to it under the Policy, Crysknife has been damaged in the amount of $5,469,186.79 as a result of Liberty's breach of the Policy.

**WHEREFORE**, because Crysknife, a judgment creditor of McDevitt, has superior rights to amounts held by Liberty in accordance with the Policy, Crysknife respectfully requests an order pursuant to CPLR § § 5225 and 5227: (i) declaring the Judgment covered by the Policy, (ii) directing Liberty to turn over to Crysknife all amounts owed by Liberty pursuant to the Policy, and (iii) granting Crysknife such further relief as the Court deems just and proper.

Dated:  New York, New York
September 15, 2022

Respectfully submitted,

BALLARD SPAHR LLP


By: */s/ Eugene Licker*
Eugene Licker

1675 Broadway, 19th Floor
New York, New York 10019
646-346-8074
lickere@ballardspahr.com

*Attorneys for Plaintiff*
*Crysknife Capital*