UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CRYSKNIFE CAPITAL,

                Plaintiff and Counter-
                Defendant,

        -v.-

LIBERTY SPECIALTY MARKETS and CERTAIN
UNDERWRITERS AT LLOYD'S, SPECIFICALLY
LIBERTY SYNDICATE 4472,

                Defendants and Counter-
                Claimants.

22 Civ. 7912 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

      A federal court found nonparty Sean McDevitt liable for breaching a
guaranty he signed in connection with a transaction between nonparty KLS
Diversified Master Fund, L.P. ("KLS") and his former company, nonparty
Sensei, Inc. ("Sensei").  This action is about whether Sensei's insurance covers
McDevitt's liability in that underlying action.  Insurer-defendants Liberty
Specialty Markets ("Liberty") and Certain Underwriters at Lloyd's, Specifically
Liberty Syndicate 4472 ("Lloyd's," and together with Liberty, "Defendants"),
now move for judgment on the pleadings, contending that certain exclusions in
the relevant insurance policy foreclose coverage.  Crysknife Capital ("Plaintiff"),
as assignee of McDevitt's rights under that insurance policy, cross-moves for
summary judgment, contending that (i) coverage has been established; (ii) no
exclusions apply; and (iii) Defendants are liable for the full amount of the
judgment in the underlying litigation, notwithstanding the policy's limits,
because Defendants acted in bad faith.  Because Plaintiff has established that

there are no genuine disputes of material fact that coverage exists and that no

exclusions apply, but has failed to show bad faith, Plaintiff's motion for

summary judgment is granted in part and denied in part, and Defendants'

motion for judgment on the pleadings is denied.

**BACKGROUND**[1]

**A.    Factual Background**

**1.    The Underlying Summary Judgment Decision and the Subsequent Second Circuit Decision**

The following facts are drawn from Judge Liman's thorough Summary

Judgment Decision, published on December 15, 2020, granting summary

judgment in favor of KLS.  (*See generally* Summary Judgment Decision).  The

---

[1]    The Court sources the facts for Defendants' motion for judgment on the pleadings from the Complaint (Dkt. #1 ("Compl.")), and the exhibits attached thereto, including Judge Liman's summary judgment decision in *KLS Diversified Master Fund, L.P.* v. *McDevitt*, 507 F. Supp. 3d 508 (S.D.N.Y. 2020), attached to the Complaint as Exhibit 5 (Compl., Ex. 5 (the "Summary Judgment Decision")); the Second Circuit's summary affirmance of the Summary Judgment Decision in *KLS Diversified Master Fund, L.P.* v. *McDevitt*, No. 21-1263, 2022 WL 2759055 (2d Cir. July 13, 2022) (summary order), attached to the Complaint as Exhibit 8 (Compl., Ex. 8 (the "Second Circuit Decision")); as well as from Executive Liability Insurance Policy No. ELL-P-0497655, originally attached to the Complaint as Exhibit 1, but subsequently refiled in unredacted form (Dkt. #23 (the "Policy")).

The Court sources the facts for Plaintiff's cross-motion for summary judgment from the sources named above (which were also submitted in conjunction with Plaintiff's motion), as well as Plaintiff's Local Rule 56.1 Statement (Dkt. #35-21 ("Pl. 56.1")); the Affirmation of Althea Daley and attached exhibits (Dkt. #35-3 ("Daley Aff.")); the Declaration of Ashley Reynolds (Dkt. #35-2 ("Reynolds Decl.")); and the Affirmation of Eugene Licker and attached exhibits (Dkt. #35-16 ("Licker Aff.")).  The Court also considers Defendants' response to Plaintiff's Rule 56.1 Statement and Counterstatement of Material Facts.  (Dkt. #39 ("Def. 56.1")).  Citations to the parties' Rule 56.1 Statements incorporate by reference the documents cited therein.

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion for judgment on the pleadings as "Def. Br." (Dkt. #30); to Plaintiff's memorandum of law in support of its motion for summary judgment and in opposition to Defendants' motion for judgment on the pleadings as "Pl. Br." (Dkt. #35-1); to Defendants' reply in support of their motion for judgment on the pleadings and in opposition to Plaintiff's motion for summary judgment as "Def. Reply" (Dkt. #38); and to Plaintiff's reply in support of its motion for summary judgment and in further opposition to Defendants' motion for judgment on the pleadings as "Pl. Reply" (Dkt. #40).

Court summarizes only the portions of the Summary Judgment Decision that are relevant to the instant coverage dispute.

At some point in 2014, McDevitt became majority owner and CEO of Sensei. (Summary Judgment Decision 1). Approximately two years later, he became Chairman of the company. (*Id.*). Due to various financial difficulties, Sensei entered into negotiations with KLS to obtain financing. (*Id.* at 2). Those negotiations culminated in KLS buying a $3.33 million promissory note from Sensei for a purchase price of $2 million. (*Id.*; Pl. 56.1 ¶ 1). The terms of the note bound Sensei to, among other things, apprise KLS promptly of any "legal actions pending or threatened in writing against" Sensei, and timely file "all required tax returns and reports and timely pay" all taxes owed by Sensei. (Summary Judgment Decision 4-5). All principal and unpaid accrued interest under the note would become due and payable if certain "Events of Default" occurred, including a failure to timely pay on the note or a default in performance of the aforementioned promises. (*Id.* at 5-6).

As part of this transaction, McDevitt executed a conditional guaranty, which was signed in his personal capacity. (Summary Judgment Decision 2-3; Pl. 56.1 ¶ 4). The conditional guaranty made McDevitt personally liable on the note if any one of six "Recourse Events" occurred. (Summary Judgment Decision 6-7). Those Recourse Events included:

> a. any fraud or intentional or willful misrepresentation by [McDevitt or Sensei], or any intentional or willful failure to disclose a material fact in connection with the issuance of the Note or at any time the Note is outstanding;

***

c. any material breach of the material terms of the Note (including, without limitation, with respect to restrictions on indebtedness, liens, dispositions of assets, distributions in respect of capital stock, payments of subordinated indebtedness, intellectual property, or affiliate transactions) directly or indirectly caused by Guarantor;

***

f. [any situation in which Sensei] becomes liable for any taxes, penalties, fees or similar charges under foreign, federal, state or local tax laws or applicable rules or regulations, the payment of which would materially and adversely affect [Sensei.]

(*Id.* at 7). The conditional guaranty noted that McDevitt would "obtain substantial direct and indirect benefits from the issuance of the Note." (*Id.* at 8).

Sensei failed to pay the principal on the note that was owed to KLS on the note's January 9, 2019 due date. (Summary Judgment Decision 22). KLS then filed suit for breach of guaranty against McDevitt on April 26, 2019, seeking to hold him personally liable for the amount due on the note. (*Id.* at 23). In its motion for summary judgment, KLS argued that McDevitt and/or Sensei triggered three of the guaranty's Recourse Events. *First*, McDevitt or Sensei triggered Recourse Event (a) by making willful misrepresentations or omissions of material fact by failing to disclose legal arrangements with the law firm Porter Wright Morris & Arthur LLP ("Porter Wright"), a finder's agreement with Jonathan Schwartz, and litigation related to those agreements, and by making willful or intentional misrepresentations about an offer in compromise

4

process to settle certain tax liabilities. (*Id.* at 32). *Second*, McDevitt or Sensei triggered Recourse Event (c) by failing to disclose threatened litigation ultimately brought related to the Porter Wright and Schwartz agreements and by failing to timely file and pay taxes. (*Id.*). And *third*, McDevitt or Sensei triggered Recourse Event (f) by incurring taxes, penalties, or interest that materially affected Sensei and that was caused by or known to McDevitt. (*Id.*).

As relevant to the instant dispute, Judge Liman first found that McDevitt triggered Recourse Event (a) because of the threatened and pending litigation brought against Sensei and McDevitt related to legal agreements with Porter Wright. (Summary Judgment Decision 36).[2] Porter Wright threatened a lawsuit against Sensei on November 25, 2015, due to unpaid legal bills, via an email to McDevitt. (*Id.* at 36-37). Porter Wright eventually sued McDevitt and Sensei in April 2017 to collect $160,000. (*Id.*). McDevitt did not disclose Porter Wright's threat to sue to KLS at the time of the note transaction, nor did he apprise KLS at any point during 2017 of the fact that a lawsuit had been filed. (*Id.* at 37). Judge Liman found that McDevitt's conduct in connection with the Porter Wright litigation triggered Recourse Event (a) in two ways. *First*, "Sensei's failure to disclose Porter Wright's threatened lawsuit at the time of the Transaction … rendered misleading the representation that" except for certain disclosed agreements, "there is no [a]ction pending or … currently threatened" against Sensei or any of its officers. (*Id.* (internal quotation marks and

---

[2]    The Court omits significant discussion of the balance of Judge Liman's Summary Judgment Decision, which found several other breaches of the guaranty that are not relevant to the instant dispute.

citations omitted)).  *Second*, Judge Liman found that McDevitt's failure to disclose the litigation was "intentional or willful." (*Id.* at 38).  Judge Liman noted that McDevitt offered no explanation for failing to disclose the threat of litigation, particularly since Porter Wright's email in this regard was unambiguous. (*Id.*).  Because Sensei disclosed certain threatened litigations implicating lower amounts to KLS, Judge Liman reached "the ineluctable conclusion that McDevitt's failure to disclose the much larger sum as to which Porter Wright was threatening suit was intentional and willful." (*Id.*; *see also id.* at 36 ("McDevitt made willful and intentional misrepresentations or omissions of material fact in connection with the failure to disclose the threatened and pending Porter Wright [l]itigation[.]")).[3]

Later in the Summary Judgment Decision, Judge Liman found that Recourse Event (c) was triggered by McDevitt's conduct associated with Sensei's failure to timely file and pay taxes. (Summary Judgment Decision 54).[4]  Under the note, Sensei was to "timely file and pay its taxes." (*Id.* at 55). However, Sensei — through McDevitt — filed its first quarter 2018 taxes one month after the deadline, and even then did not pay the full amount due. (*Id.*). Further, Sensei did not pay state taxes between January 1, 2018, and May 25, 2018. (*Id.* at 55-56).  Judge Liman found that McDevitt could not avoid liability under the guaranty by "attempt[ing] to later reduce [tax] liabilities through the

---

[3]  Judge Liman goes on to distinguish Recourse Event (c) from Recourse Event (a), the subject of this paragraph, by noting that only Recourse Event (a) "requires a finding of intent or willfulness[.]"  (Summary Judgment Decision 51).

[4]  Judge Liman specifically noted that he "need not and does not reach the question whether [KLS] is entitled to summary judgment with respect to Recourse Events (a) and (f)" as it related to Sensei's taxes.  (Summary Judgment Decision 54).

[offer in compromise] process or by personal payments," or by appealing to KLS's decision to pay off the full amount of the tax liabilities. (*Id.* at 56).

Based on his findings that McDevitt's conduct triggered the above-discussed Recourse Events (and others not relevant to the instant case), Judge Liman granted KLS's motion for summary judgment against McDevitt. (Summary Judgment Decision 60). Together with interest, the judgment entered by Judge Liman is valued at $5,469,186.79 as of the time that Plaintiff commenced the instant action. (Pl. 56.1 ¶ 9).

McDevitt appealed Judge Liman's Summary Judgment Decision to the Second Circuit. (Pl. 56.1 ¶ 10). On July 13, 2022, the Second Circuit affirmed Judge Liman's judgment in a summary order. (*See generally* Second Circuit Decision). The Second Circuit began its analysis by noting that "[a]ny one Recourse Event is sufficient to establish McDevitt's liability and therefore to affirm the judgment of the district court." (*Id.* at 4). The Circuit then affirmed the Summary Judgment Decision on one basis: "that Sensei's failure to file and pay taxes on time triggered Recourse Event [(c)], which requires a material breach of the material terms of the Note … directly or indirectly caused by [McDevitt]." (*Id.* (internal quotation marks and citation omitted); *see also id.* at 4 n.3 ("Because we hold that the breach of tax covenant triggered Recourse Event [(c)], we need not decide whether the district court properly concluded that McDevitt triggered Recourse Events [(a)] and [(c)] by failing to disclose the Porter Wright and Schwartz litigations.")). In so affirming Judge Liman, the Second Circuit rejected McDevitt's arguments that any breach of the tax-

7

related covenant was not material because McDevitt later paid off tax liabilities,

reasoning that "Sensei was still liable for the unpaid federal taxes and

penalties." (*Id.* at 5).  The Second Circuit also found that the breach was

caused by McDevitt — despite McDevitt laying blame on his tax advisor —

because "McDevitt had ultimate control over whether and when taxes were

filed." (*Id.*).

### 2. The Insurance Policy

Defendants issued the Policy to Sensei with an effective policy period of

June 7, 2018, to June 7, 2019.  (*See generally* Policy).[5]  The Policy's Directors,

Officers and Company ("D&O") Liability Coverage Part provides that

> The Insurer shall pay on behalf of the Insured Persons
> Loss for which the Insured Persons are not
> indemnified by the Company and which the Insured
> Persons become legally obligated to pay by reason of
> any Claim first made against the Insured Persons
> during the Policy Period or the Discovery Period, if
> exercised, for any Wrongful Acts by the Insured
> Persons.

(*Id.*, Directors, Officers and Company Liability Coverage Part § 1.A.).

Defendants do not dispute that McDevitt is an "Insured Person" as understood

in this coverage grant, nor that the instant case involves a "Claim."  The Policy

provides a limit of liability of up to $5 million in the aggregate for D&O

coverage.  (*Id.*, Policy Schedule).

---

[5]     In their answer, Defendants admit that Liberty Specialty Markets "is a trade name for
Liberty Corporate Capital Ltd. (for and on behalf of Syndicate 4472 of Lloyd's of
London)," and that Syndicate 4472 "is an insurance syndicate at Lloyd's of London,
[and] that Liberty Corporate Capital Ltd. is the member of Syndicate 4472[.]"  (Answer
¶¶ 18-19).  For the sake of simplicity and because it does not bear on the issues before
the Court, the Court refers to actions taken by either Liberty or Lloyd's as attributable
to "Defendants," notwithstanding Defendants' subsequent clarifications.  (*See, e.g.*, Def.
56.1 ¶ 17 (noting that Syndicate 4472 is the insurer, not Liberty)).

The Policy's D&O coverage is subject to certain exclusions potentially relevant to the instant cross-motions:

> A. The Insurer shall not be liable under any Insuring Clause in this Coverage Part for Loss on account of any Claim made against any Insured:
>
> ***
>
> 2. based upon, arising out of, or attributable to any written demand or proceeding against any Insured which was made or pending on or before the applicable Prior Litigation Date set forth in the Coverage Schedule in Item IV(B) of the Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;
>
> ***
>
> 6. based upon, arising out of, or attributable to any deliberately fraudulent or criminal act or omission or any willful violation of law by such Insured if a final adjudication in such Claim establishes that such act, omission or violation occurred; [or]
>
> 7. based upon, arising out of, or attributable to such Insured gaining in fact any profit, remuneration or financial advantage to which such Insured was not legally entitled if a final adjudication in such Claim establishes that such profit, remuneration or financial advantage occurred[.]

(Policy, Directors, Officers and Company Liability Coverage Part § IV.A.2, 6-7). As relevant to Exclusion A.2., the Prior Litigation Date for D&O coverage is June 7, 2018.  (*Id.*, Policy Schedule).

### 3.    McDevitt's Notification of the Claim, the Assignment to Plaintiff, and the Subsequent Demands

On May 8, 2019, McDevitt notified Defendants of the action pending against him before Judge Liman to recover on the unpaid note (the "KLS Action").  (Pl. 56.1 ¶ 18).  Defendants defended McDevitt in the KLS Action, but

subsequently denied him indemnity coverage.  (*Id.* ¶ 19).  While the appeal of the Summary Judgment Decision was pending, KLS assigned the judgment in the KLS Action to Plaintiff in the instant case.  (*Id.* ¶ 13).  On or about April 25, 2022, Plaintiff and McDevitt entered into a settlement agreement, whereby Plaintiff agreed to discount the KLS judgment in exchange for assignment of McDevitt's rights under the Policy.  (*Id.* ¶ 14).  Plaintiff then attempted to withdraw the judgment in the KLS Action, but the Second Circuit nonetheless rendered the Second Circuit Decision.[6]

Following McDevitt's assignment to Plaintiff, Plaintiff attempted to negotiate with Defendants.  In particular, Plaintiff offered to release its claims against McDevitt pursuant to the judgment in exchange for payment of the remaining limits of the Policy.  (Pl. 56.1 ¶ 21).  Defendants denied Plaintiff's offer.  (Licker Aff. ¶¶ 4, 5).

## B.   Procedural Background

Plaintiff commenced the instant action by filing the Complaint on September 15, 2022.  (Dkt. #1).  On September 23, 2022, this Court denied Defendants' request to relate the case to the KLS Action and to transfer the case to Judge Liman.  (Dkt. #13).  On November 19, 2022, Defendants filed an answer with a counterclaim for declaratory relief.  (Dkt. #19).  Plaintiff answered the counterclaim on November 22, 2022.  (Dkt. #20).  After the parties apprised the Court that this case could potentially be resolved through

---

[6]     Defendants object to facts associated with the settlement and post-assignment demands on the basis that they are "irrelevant," but do not otherwise offer any facts to contest Plaintiff's Rule 56.1 Statement.

early dispositive motion practice, the Court held a pre-motion conference on November 30, 2022.  (November 30, 2022 Minute Entry).  In line with the discussion held at that conference, the Court endorsed the parties' proposed briefing schedule on the instant motions on December 5, 2022.  (Dkt. #25).

On January 13, 2023, Defendants submitted their motion for judgment on the pleadings and supporting papers.  (Dkt. #28-30).  On February 15, 2023, Plaintiff filed its motion for summary judgment and opposition to Defendants' motion, as well as supporting papers.  (Dkt. #35).  On March 13, 2023, Defendants submitted their combined reply in support of their motion for judgment on the pleadings and opposition to Plaintiff's summary judgment motion, as well as their Local Rule 56.1 statement.  (Dkt. #38-39).  Finally, Plaintiff submitted its reply in further support of its motion for summary judgment and in further opposition to Defendants' motion on March 20, 2023. (Dkt. #40).

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[7]  A fact

---

[7]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of

is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations, quotation marks, and emphasis omitted). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

---

material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

### 2. Motions for Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c)[8]

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lively* v. *WARFA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch* v. *City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)). Applying this standard requires courts to "draw all reasonable inferences in [the non-movant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see generally Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

"On a [Rule] 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks and citation omitted); *see also Lively*, 6 F.4th at 305 (explaining that a

---

[8]   The Court notes that despite moving under different Federal Rules, much of the relevant evidence for Plaintiff's motion for summary judgment and Defendants' motion for judgment on the pleadings is attached to or otherwise incorporated by reference in the Complaint. Thus, the Court can consider the duplicative evidence in ruling on Defendants' motion without converting the motion into one for summary judgment. *See EMA Fin., LLC* v. *AIM Expl., Inc.*, No. 18 Civ. 145 (ER), 2019 WL 689237, at *6 n.6 (S.D.N.Y. Feb. 19, 2019) (adopting this approach for analogous cross-motions).

court "should remain within the non-movant's pleading when deciding"
Rule 12(c) motions). A complaint is "deemed to include any written instrument
attached to it as an exhibit, materials incorporated in it by reference, and
documents that, although not incorporated by reference, are integral to the
complaint." *L-7 Designs, Inc.*, 647 F.3d at 422 (internal quotation marks and
citations omitted).

### 3. The Court Applies New York Law to Resolve the Parties' Disputes

As a threshold matter, the parties dispute which state's law governs the
interpretation of the Policy. Defendants argue that substantive New York law
applies, based on the choice of law rules of the forum state — *i.e.*, New York.
(Def. Br. 9-10). Plaintiff argues that New York choice of law rules counsel in
favor of applying Delaware substantive law, but clarifies that there is in fact no
conflict between Delaware law and New York law that would affect the outcome
of this case. (Pl. Br. 8 (noting that "[a]bsent a conflict between the two states'
laws, there is no need to determine the applicable law"); Pl. Reply 1 ("As a
threshold matter, the choice [of law] need be made only if there is a real conflict
between the candidates, and here there is not.")). Though Defendants do not
express a view on whether New York and Delaware law differ in any relevant
material respect, Defendants do note that the Court is not obliged to engage in
a choice of law analysis should there be no actual conflict between the
respective states' law. (Def. Reply 2 n.2).

"Where jurisdiction rests upon diversity of citizenship, a federal court
sitting in New York must apply the New York choice-of-law rules[.]" *Stuart* v.

14

*Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998).  "Under New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented." *Fed. Ins. Co.* v. *Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (citing *Fieger* v. *Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001)).  Neither party has identified a material difference in New York or Delaware law that would affect the outcome of this case.  Further, Plaintiff repeatedly asserts that there is no actual conflict of laws.  Thus, by arguing that New York or Delaware law applies, the parties have jumped the gun, and proceeded straight to the choice of law arguments without first determining that a conflict exists.  *See, e.g.*, *Nat'l Oil Well Maint. Co.* v. *Fortune Oil & Gas, Inc.*, No. 02 Civ. 7666 (LBS), 2005 WL 1123735, at *4 (S.D.N.Y. May 11, 2005) ("[Defendant] concedes … that there is no difference between the law of British Columbia and the law of New York on the contract formation issues pertinent here.  Where there is no actual conflict, courts are free to dispense with the choice of law analysis and apply New York law."); *see also Mech. Plastics Corp.* v. *W.W. Grainger, Inc.*, No. 12 Civ. 4688 (LAK) (MHD), 2013 WL 12333770, at *8 n.9 (S.D.N.Y. Oct. 3, 2013) (applying New York law because the parties agreed there is no conflict between New York and Illinois law).

In any event, the Court has undertaken its own review and agrees with Plaintiff that there is no real conflict between New York and Delaware law relevant to the instant dispute.  The Court does not find any difference in the two states' laws as it relates to the understanding of "final adjudication."

15

*Compare 135 Evergreen Corp.* v. *Delvalle*, 115 N.Y.S.3d 804, 2019 WL 2275480, at *1 (Sup. Ct. App. Term May 24, 2019) ("[R]es judicata, or claim preclusion, requires a final adjudication on the merits."), *and McGrath* v. *Gold*, 36 N.Y.2d 406, 412 (1975) ("To invoke collateral estoppel, the issue of ultimate fact must have been determined by a 'final judgment.'"), *with Thomas & Agnes Carvel Found.* v. *Carvel*, No. 08 Civ. 3185 (VCP), 2008 WL 4482703, at *9 & n.86 (Del. Ch. Sept. 30, 2008) (noting that "for purposes of issue preclusion, a decision that has been affirmed on appeal constitutes a final judgment," and that "'final judgment' includes any prior adjudication ... that is determined to be sufficiently firm to be accorded conclusive effect"), *aff'd*, 970 A.2d 256 (Del. 2009). Nor do the states differ in their interpretation of insurance contracts in a manner that would be relevant to this case. *Compare In re Adelphia Commc'ns Corp.*, 638 B.R. 506, 515 (Bankr. S.D.N.Y. 2022) (noting that under New York law, "[e]xclusions to coverage must be strictly construed and read narrowly, with any ambiguity construed against the insurer" (internal quotation marks and citation omitted)), *reconsideration denied*, 639 B.R. 657 (Bankr. S.D.N.Y. 2022), *with Twin City Fire Ins. Co.* v. *Delaware Racing Ass'n*, 840 A.2d 624, 631 (Del. 2003) (discussing application of the *contra preferentem* rule to exclusionary clauses).

Because there is no actual conflict, that is the end of the inquiry. *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) ("If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law."); *Wall* v. *CSX Transp., Inc.*, 471 F.3d

410, 422 (2d Cir. 2006) ("As there is no conflict, for practical reasons, that is, for ease of administrating the case, New York, as the forum state, would apply its law.").  Accordingly, the Court applies substantive New York law.[9]

### 4.   Interpretation of Insurance Policies and Their Exclusions Under New York Law

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Porco* v. *Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (internal quotation marks omitted) (quoting *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001)).  Under New York law, the interpretation of a contract "is a matter of law for the court to decide." *Int'l Multifoods Corp.* v. *Comm. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks and citation omitted); *see also Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("[T]he initial interpretation of a contract is a matter of law for the court to decide." (internal quotation marks and citation omitted)).  "[A] court

---

[9]      The Court does not fully agree with Plaintiff's (apparent) assessment that New York and Delaware law are in accord with respect the bad faith doctrine.  However, Plaintiff's proffered theory of bad faith related to the settlement offers would be treated the same under both states' law.  To the extent that the Court must make a choice between Delaware and New York under the "grouping of contacts" test, *Schwartz* v. *Liberty Mut. Ins. Co.*, 539 F.3d 135, 151 (2d Cir. 2008), the Court chooses New York law.  Plaintiff's own Complaint claims that "Liberty and Sensei negotiated the Policy through their agents in New York"; that the Policy was administered through a third-party claims administrator in New York; that all of the underlying litigation relevant to the instant case took place in New York; and that the declination of coverage was made in New York.  (Compl. ¶ 25).  The Summary Judgment Decision applied New York law to interpret all of the relevant transaction documents.  (Summary Judgment Decision 30).  Though the relevant insured risk appears mixed here — given that Sensei was headquartered in Florida and incorporated in Delaware, while McDevitt evidently was domiciled in Texas — "[i]t is commonplace for courts applying New York choice-of-law rules to disregard (or at least discount) the location of the insured risk when the risk is located in two or more states." *Schwartz*, 539 F.3d at 152 (quoting *Maryland Cas. Co.* v. *Cont'l Cas. Co.*, 332 F.3d 145, 153 (2d Cir. 2003)).

should accord [contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish" when interpreting a contract.  *Palmieri* v. *Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (internal quotation marks and citation omitted).

"Whether the language of an insurance policy is ambiguous is a question of law[.]"  *Duane Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010).  Where ambiguity exists in an insurance contract, it must be resolved in favor of the insured.  *Id.* (citing, *inter alia*, *Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*, 252 F.3d 608, 615 (2d Cir. 2001) ("[W]e are guided by New York's well-established *contra proferentem* rule, pursuant to which unresolvable ambiguities in insurance contracts are construed in favor of the insured.")).  Policy terms are ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Olin Corp.* v. *Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks and citation omitted).

Additionally, "[t]he law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds."  *Beazley Ins. Co., Inc.* v. *ACE Am. Ins. Co.*, 880 F.3d 64, 68 (2d Cir. 2018) (internal quotation marks and citation omitted).  Thus, "[t]he insurer bears the burden of

establishing that an exclusion under the insurance policy applies." *Barney Greengrass, Inc.* v. *Lumbermens Mut. Cas. Co.*, 445 F. App'x 411, 413 (2d Cir. 2011) (summary order) (citing *Consol. Edison Co. of N.Y., Inc.* v. *Allstate Ins. Co.*, 98 N.Y.2d 208, 220 (2002)).  "To the extent that there is any ambiguity in an exclusionary clause," a court applying New York law must "construe the provision in favor of the insured."  *Cragg* v. *Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011).  In line with this mandate, exclusionary clauses in an insurance policy are interpreted strictly and narrowly:

> [W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language.  Any such exclusions or exceptions from policy coverage must be specific and clear in order to be enforced.  They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction. Indeed, before an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation.

*Pioneer Tower Owners Ass'n* v. *State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009) (quoting *Seaboard Sur. Co.* v. *Gillette Co.*, 64 N.Y.2d 304, 311 (1984)).

**B.  Analysis**

### 1.  The Relevant "Final Adjudication" Does Not Establish That McDevitt Engaged in a Willful Violation of Law

Defendants argue that the Policy excludes coverage under the three exclusions discussed in Section A.2 of the Background.  The Court refers to these exclusions as the "Prior Litigation Exclusion" (Policy, Directors, Officers and Company Liability Coverage Part § IV.A.2), the "Improper Conduct

19

Exclusion" (*id.*, § IV.A.6), and the "Improper Advantage Exclusion" (*id.*, § IV.A.7), respectively.  Both the Improper Conduct and Improper Advantage Exclusions require that "a final adjudication in such Claim establishes" that improper conduct or improper advantage transpired.  (*Id.*, § IV.A.6-7).  This language thus invites a threshold question: what is the final adjudication here, where both Judge Liman and the Second Circuit issued decisions in the underlying action?  Unsurprisingly, the parties disagree, insofar as the Summary Judgment Decision offers multiple bases for Defendants to argue that the Policy excludes coverage, whereas the Second Circuit Decision offers only one.  (Def. Br. 11-13 (contending that the Summary Judgment Decision constitutes a "final adjudication"); Pl. Br. 16-19 (arguing that the Second Circuit Decision constitutes a "final adjudication")).  The Court agrees with Plaintiff that the Second Circuit Decision is *the* final adjudication relevant to the Policy's Improper Conduct and Improper Advantage Exclusions, and, further, that the Second Circuit Decision did not establish that McDevitt engaged in a willful violation of law.

### a.   The Relevant Final Adjudication Is the Second Circuit Decision

Defendants point principally to dictionary definitions in arguing that the Summary Judgment Decision is the relevant "final adjudication."  For example, they note that an adjudication is a "judgment," and that a "final" judgment is one "not requiring any further judicial action by the court that rendered judgment to determine the matter litigated[.]"  *Final*, *Black's Law Dictionary* (11th ed. 2019).  Because the Second Circuit did not "render judgment" — it

only "affirm[ed] the judgment of the district court" (Second Circuit Decision 7),

Defendants argue that the Court need not look beyond the Summary Judgment

Decision (Def. Br. 12).

In line with this dictionary definition of "final," Defendants are correct to

point out the breadth of caselaw noting that the *pendency* of an appeal does

not undermine the finality of a judgment.  (Def. Br. 12).  Thus, in *CUMIS*

*Specialty Insurance Company* v. *Kaufman*, a "final adjudication" triggered

certain policy exclusions after an insured was sentenced even though his

appeal was pending.  No. 21 Civ. 11107 (DLC), 2022 WL 4534459, at *3

(S.D.N.Y. Sept. 28, 2022), *reconsideration denied*, No. 21 Civ. 11107 (DLC),

2022 WL 10640903 (S.D.N.Y. Oct. 18, 2022).[10]  In so holding, the *CUMIS* court

noted that "[u]nder New York law … it is 'well settled that the imposition of the

sentence constitutes the final judgment against the accused,' and that 'the

finality of it is not changed by the pendency of the appeal.'"  *Id.* (quoting *Dupree*

v. *Scottsdale Ins. Co.*, 12 N.Y.S.3d 62, 63 (1st Dep't 2015)); *see also id.*

(collecting cases clarifying that "final adjudication" and "final judgment" are

understood to have the same meaning)).  This Court agrees with that plain

statement of law.

But the *CUMIS* court's holding — and the dictionary definition of

"final" — have no bearing on the instant case, because the Second Circuit has

rendered its decision.  In other words, the appeal is no longer pending.  In

_____

[10]     *CUMIS* involved a quite different issue of insurance law: whether the insured was
entitled to coverage for defense costs on appeal.  It makes sense that an insurer would
not be obligated to pay defense costs for a pending appeal where an (otherwise) final
judgment has triggered exclusions.

essence, Defendants' analysis of what "final adjudication" means begins and ends with the uncontroverted point that a trial court's decision may constitute a final judgment or adjudication notwithstanding the pendency of an appeal. Yet the cases to which *CUMIS* cites expressly recognize that an appellate decision may upend or otherwise narrow the judgment, even if the pendency of the appeal does not otherwise make the judgment non-final prior to the issuance of that decision. *See, e.g.*, *Dupree*, 12 N.Y.S.3d at 63 ("While the appeal may, at some point, relieve Watts of that judgment, the finality of it is not changed by the pendency of the appeal.").

And it is here where Defendants' argument that the "final adjudication" is the Summary Judgment Decision loses sway. New York courts often must determine what constitutes a "final adjudication" in the context of collateral estoppel or res judicata. *See, e.g.*, *Rojas* v. *Romanoff*, 128 N.Y.S.3d 189, 195 (1st Dep't 2020) ("[I]ssue preclusion applies: [i] after *final adjudication* [ii] of an identical issue [iii] actually litigated and necessarily decided in the first suit and [iv] the issue was necessary to support a valid and final judgment on the merits." (emphasis added)). Thus, these doctrines provide helpful guideposts for determining what is the "final adjudication" relevant to the instant case.

Time and time again, the Second Circuit has noted that res judicata and collateral estoppel do not apply to lower court findings that are not addressed on appellate review. Indeed, "[b]oth res judicata and issue preclusion contemplate the existence of a final judgment by the highest court to have considered the case." *In re PCH Assocs.*, 949 F.2d 585, 593 (2d Cir. 1991).

22

Thus, where an appellate court intentionally declines to rule on certain issues decided by a lower court, those lower court findings are not given preclusive effect and the appellate court's silence is not read to be preclusive. *See, e.g.*, *id.* ("[W]e went to great lengths to make clear that we were not deciding that issue. To hold that our intentional decision not to resolve this issue amounts to a final adjudication on the issue would be to misapply the settled law regarding issue preclusion."); *Gelb* v. *Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986) ("However, if an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground."); *see also Greene* v. *United States*, 79 F.3d 1348, 1352-53 (2d Cir. 1996) ("To intimate that a court's reasons for declining to discuss and resolve a given issue constitute an adjudication of that issue puts the doctrine of collateral estoppel at cross-purposes indeed. Therefore, our decision not to address or decide [certain issues] does not invoke the bar of collateral estoppel and consideration of that question may now properly proceed.").

New York courts have similarly noted the limits of collateral estoppel and agreed with federal law. For example, in *Tydings* v. *Greenfield, Stein & Senior, LLP*, the Second Department rejected the argument that "absent a reversal of a trial-level ruling, or an affirmance that specifically disapproves of the reasoning of that ruling, the law as pronounced by the trial court stands as conclusive if it is affirmed, regardless of the appellate court's rationale in support." 843 N.Y.S.2d 538, 541 (2d Dep't 2007), *aff'd*, 11 N.Y.3d 195 (2008). Indeed, "once the reasoning of the [s]urrogate's [c]ourt was replaced by the reasoning of this

[c]ourt in its order on appeal, the legal reasoning used by the [s]urrogate's
[c]ourt, even though not explicitly disapproved, could not then continue to
stand as a viable statement of the law[.]" *Id.* The New York Court of Appeals
affirmed the Second Department, cited *Gelb* favorably, and noted that the
appellant had "cite[d] no case from any jurisdiction in which an alternative
holding has been held binding for collateral estoppel purposes after an
appellate court affirmed the earlier judgment without considering that holding."
*Tydings* v. *Greenfield, Stein & Senior, LLP*, 11 N.Y.3d 195, 200 (2008). In so
holding, the New York Court of Appeals noted that "*Gelb* was stating federal
law, but we hold today that New York law is the same." *Id.*

Defendants appear to contend that the Policy's use of the phrase "final
adjudication" need not be synonymous with the common law understanding of
collateral estoppel. (Def. Br. 12 n.6). But Defendants effectively offer no other
method of interpreting that phrase in this context. Had Defendants sought a
declaration that the Policy excludes coverage based on the Summary Judgment
Decision while the appeal was pending, this Court would have no concern
applying straightforward New York law and deeming the Summary Judgment
Decision "final" notwithstanding the pendency of the appeal. *See, e.g.*, *In re
Pan Am Corp.*, 166 B.R. 538, 545 (S.D.N.Y. 1993). Yet Defendants simply seek
to wish away the Second Circuit's reasoning and the fact that it rendered a
decision that today constitutes the final adjudication — one that is
substantially narrower than the Summary Judgment Decision. Indeed,
Defendants' cited cases, including *In re Pan Am Corp.*, rely on cases

interpreting the meaning of "final adjudication" in the context of the common law of collateral estoppel. *See, e.g.*, *Connelly* v. *Wolf, Block, Schorr & Solis-Cohen*, 463 F. Supp. 914, 918 n.3 (E.D. Pa. 1978) ("Absent a statute to the contrary, a pending appeal does not destroy the finality of a judgment for purposes of collateral estoppel." (cited by *In re Pan Am Corp.*)). Thus, the Court treats the Second Circuit Decision as the final adjudication relevant to applying the Policy's exclusions.[11]

### b. The Second Circuit Decision Does Not Establish That McDevitt Engaged in a Willful Violation of Tax Laws

As noted above, the Second Circuit affirmed the Summary Judgment Decision on one ground: "that Sensei's failure to file and pay taxes on time triggered Recourse Event [(c)], which requires a material breach of the material terms of the Note … directly or indirectly caused by [McDevitt]." (Second Circuit Decision 4 (internal quotation marks and citation omitted); *see also id.* & n.3 (explicitly noting that the Circuit need not decide "whether the district court properly" found that other Recourse Events had occurred, because any one Recourse Event was sufficient to establish McDevitt's liability)).

The Policy excludes coverage for any claim:

> based upon, arising out of, or attributable to any deliberately fraudulent or criminal act or omission or *any willful violation of law* by such Insured *if a final*

---

[11]   The Court is not going so far as to adopt Plaintiff's views regarding which court finds facts in the criminal and civil contexts, and whether "final adjudication" should be understood differently in those contexts. (*See* Pl. Br. 18). The Court agrees with Defendants that adopting certain of Plaintiff's broadly articulated arguments would effectively add the word "non-appealable" into the Policy's "final adjudication" language. (Def. Reply 8-9). But Defendants' arguments overlook the fact that the Second Circuit has rendered a decision, and thus issues associated with the pendency of appeals or exhaustion of appeals do not exist here.

> *adjudication* in such Claim *establishes that such* act,
> omission or *violation occurred*[.]

(Policy, Directors, Officers and Company Liability Coverage Part § IV.A.6 (emphases added)).  Defendants' argument that the Second Circuit Decision establishes that such "willful violation of law" occurred is appealing in its simplicity, but ultimately proves too much.[12]  Again citing to dictionary definitions, Defendants note that "willful" is defined as "[v]oluntary and intentional, but not necessarily malicious" and that a "violation" is defined as an "infraction or breach of the law[.]"  (Def. Br. 14-15 (quoting *Black's Law Dictionary* 1881, 1916 (11th ed. 2019))).  Because a corporation's failure to pay taxes in a timely manner is a violation of law, Defendants reason, it necessarily follows that the Second Circuit Decision "establishe[d]" such willful violation. (*Id.* at 15).

Not so.  The Second Circuit Decision has nothing to do with tax law, willful violations of law, or violations of law in general.  It simply established that because (i) the note required Sensei to timely file and pay taxes; (ii) Sensei failed to do so; and (iii) McDevitt caused the failure, Recourse Event (c) was triggered and McDevitt was personally liable on the note.  (Second Circuit Decision 4-5).  Where an insurance policy requires that an exclusion be established through adjudication, "the exclusion certainly is susceptible to the interpretation, well developed in the law of collateral estoppel, that the

---

[12]   Because Defendants argued in favor of finding that the Summary Judgment Decision is the final adjudication, much of Defendants' analysis is based on that decision. However, Defendants maintain that the result would be the same based on the Second Circuit Decision.  (Def. Br. 14 n.8).

judgment establishes dishonesty under the exclusion only if a finding of dishonesty was necessary to the judgment[.]"  *In re Donald Sheldon & Co., Inc.*, 186 B.R. 364, 370 (S.D.N.Y. 1995) (citing *Parklane Hosiery Co.* v. *Shore*, 439 U.S. 322 (1979)), *aff'd*, 182 F.3d 899 (2d Cir. 1999).  Defendants object to Plaintiff's citation to *Sheldon*, on the basis that *Sheldon* concerned how to construe a jury's general verdict as it related to an exclusion, and thus the *Sheldon* court simply "borrow[ed]" concepts from collateral estoppel to provide some limiting principle.  (Def. Reply 9-10).  But at a minimum, the Policy language pertaining to a "final adjudication establishing" that an exclusion is applicable is reasonably susceptible to Plaintiff's proffered interpretation that the "final adjudication" — the Second Circuit Decision — must necessarily find that state or federal law was violated, and that such law was violated willfully. (Pl. Br. 20).  *See, e.g.*, *Francaise S.A.* v. *Halbart*, 189 F.3d 461 (2d Cir. 1999) (construing exclusion against insurer because exclusion was "reasonably susceptible to more than one meaning" (internal quotation marks and quotation marks omitted)).

The Second Circuit did not find a violation of any specific statute or law. And it did not make a finding of "willfulness."[13]  Defendants' argument that the Second Circuit Decision established a willful violation of tax law relies on too many inferential leaps, both factual and legal, as to what the Second Circuit established.  For starters, it does not follow that, simply because a corporation

---

[13]    Indeed, the Summary Judgment Decision, oft-cited by Defendants, emphasizes that Recourse Event (c) does not require a finding of intent or willfulness.  (Summary Judgment Decision 51).

*may be* liable for failing to pay taxes, the Second Circuit necessarily established a willful violation of tax law by determining that Sensei's failure to pay its taxes constituted a breach and that McDevitt was liable for that breach.  (Second Circuit Decision 4-5).[14]  Indeed, a "[a]n insurer claiming that a loss is excluded by a policy term has the burden of demonstrating that the term expressly excludes the loss — exclusions are not extended by interpretation or implication."  *Sheldon*, 186 B.R. at 369 (citing, *inter alia*, *McCormick & Co.* v. *Empire Ins. Group*, 878 F.2d 27, 30 (2d Cir. 1989)).  The Court will not stretch the Policy's language to exclude coverage based on findings the Second Circuit did not make.

The outcome would be the same even without reference to collateral estoppel principles.  For example, under the Policy, a "final adjudication" must "establish" that "a willful violation" occurred.  While Defendants spend much time on what "final adjudication" means, they gloss over the phrase "establish." Yet New York courts passing on such language have held it to a high standard.  *See, e.g.*, *J.P. Morgan Sec. Inc.* v. *Vigilant Ins. Co.*, 2 N.Y.S.3d 415, 420 (2d Dep't 2015) (holding, in context of dishonest acts exclusion, both that there must be

---

14      Further, the Court hardly finds it necessary to entertain Defendants' scattershot citations to various provisions of state and federal tax law.  (*See* Def. Br. 15).  Defendants do not even attempt to explain how the Second Circuit Decision (or the Summary Judgment Decision) established that, for example, McDevitt violated 26 U.S.C. § 6672(a).  (Def. Br. 15).  "It is well established that the statute requires two elements to be present before personal liability for unpaid withholding taxes attaches: first, the individual must be a person responsible for the collection and payment of withholding taxes, *i.e.*, he must have the authority to direct the payment of corporate funds; second, the individual's failure to comply with the statute must be willful." *United States* v. *Rowe*, No. 19 Civ. 5770 (WFK), 2020 WL 5549085, at *3 (E.D.N.Y. Sept. 16, 2020), *aff'd*, 858 F. App'x 405 (2d Cir. 2021) (summary order).  Defendants do not map any of these elements onto the underlying opinions.

an "adjudication" and that the adjudication must "establish" — *i.e.* "'to put beyond doubt'" — that such acts occurred (quoting *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003))).  Again, without any reference to a law that was violated, or to the level of intent associated with such a violation, it can hardly be said that the Second Circuit Decision "put beyond doubt" that McDevitt engaged in a "willful violation of law[.]"

Finally, even accepting Defendants' contention that the Second Circuit Decision established a willful violation of law — which the Court does not — the exclusion pertains to a "willful violation of law *by such Insured*" — here, McDevitt.  Yet Recourse Event (c) is tied to material breaches of Sensei's obligations under the note, not McDevitt's.  In particular, Recourse Event (c) was triggered when McDevitt caused *Sensei* to fail to pay and file taxes in a timely manner.  Thus, the Second Circuit Decision speaks only to *Sensei's* "tax-related breach," not McDevitt's own failure to pay taxes.  (Second Circuit Decision 5).  The Second Circuit Decision refers only to Sensei's acts of breach on this point, even if McDevitt's conduct was sufficient to create personal liability under the guaranty.  (*See, e.g.*, *id.* at 4 ("Sensei's failure to file and pay federal and state taxes on time was also a material breach."), 5 ("Sensei was still liable for the unpaid federal taxes and penalties")).[15]  Defendants have no

---

[15]    Defendants contend that Plaintiff's argument that the nonpayment of taxes was Sensei's act, not McDevitt's, "impermissibly ignores Judge Liman's finding directly to the contrary."  (Def. Reply 15).  But nothing in the Summary Judgment Decision is at odds with the Second Circuit Decision on this point: that the obligation to timely pay and file taxes was Sensei's alone, even if McDevitt caused Sensei to fail to do so.  (*See, e.g.*, Summary Judgment Decision 55 ("The obligation to 'timely' file and pay taxes required Sensei to meet all applicable deadlines both with respect to filing and with respect to payment."), *id.* ("Sensei failed to satisfy this covenant."), *id.* at 56 ("The affirmative

response to Plaintiff's argument that the Policy's own language notes that wrongful acts of one insured shall not be imputed to another, nor do they respond to the argument that if anyone had violated tax law, it would have been Sensei, not McDevitt.  (Pl. Br. 21).  The Second Circuit Decision establishes only that Sensei's tax-related breach was caused by McDevitt, thus there is no "willful violation of law by [McDevitt]" established by that decision.

### 2. Even Considering the Summary Judgment Decision, Defendants Have Not Proven That a Final Adjudication Triggered an Exclusion[16]

Even if the Court were to consider the Summary Judgment Decision and its findings as the "final adjudication" relevant to certain Policy exclusions, Defendants have not borne their burden of establishing that an exclusion applies based on that decision.  *Consol. Edison Co. of New York*, 98 N.Y.2d at 220.

#### a. The Summary Judgment Decision Does Not Establish That McDevitt Engaged in Deliberately Fraudulent Conduct

The Court has already discussed the Improper Conduct Exclusion.  That exclusion bars coverage for "willful violation[s] of law," and for "for Loss on account of any Claim made against any Insured … based upon, arising out of, or attributable to any deliberately fraudulent … act or omission[.]"  (Policy,

---

covenant required Sensei to timely file and pay taxes.")).  While McDevitt was on the hook under the guaranty because he caused these failures, Sensei would have been the entity in violation of the law.

[16]   The Court does not engage with Plaintiff's apparent contention that the pre-Second Circuit Decision settlement with Plaintiff may have mooted the appeal or Judge Liman's decision.  The Second Circuit evidently disagreed, and Plaintiff hardly raises the point. (Pl. Br. 17 n.11).

Directors, Officers and Company Liability Coverage Part § IV.A.6). Again, "a final adjudication" must "establish[] that such act [or] omission ... occurred." (*Id.*). Because the Summary Judgment Decision found that McDevitt's conduct triggered Recourse Event (a) because he intentionally and willfully misrepresented or omitted material facts in connection with the threatened and pending Porter Wright litigation (Summary Judgment Decision 36), Defendants contend that the Decision necessarily established that he "engaged in deliberately fraudulent conduct" under the Improper Conduct Exclusion (Def. Br. 13). Defendants' arguments on this point largely fail for the same reasons discussed above.

Nothing in the Summary Judgment Decision establishes a deliberately fraudulent act or omission by McDevitt, in either the collateral estoppel sense (*i.e.*, necessary to the judgment), or in the colloquial sense of "establish." Recourse Event (a) triggered McDevitt's personal liability on the note due to

> any fraud *or* intentional or willful misrepresentation by [McDevitt or Sensei], *or* any intentional or willful failure to disclose a material fact in connection with the issuance of the Note or at any time the Note is outstanding[.]

(Summary Judgment Decision 7 (emphasis added)). Notably, Recourse Event (a) employs the word "or" disjunctively, meaning that it can be triggered by "fraud," an "intentional or willful misrepresentation," or "any intentional or willful failure to disclose[.]" *See, e.g., Del Glob. Techs. Corp.* v. *Park*, No. 03 Civ. 8867 (PGG), 2008 WL 5329963, at *4 (S.D.N.Y. Dec. 15, 2008) (noting that "the disjunctive 'or' ... indicat[es] an alternative event"); *Portside Growth &*

*Opportunity Fund* v. *Gigabeam Corp.*, 557 F. Supp. 2d 427, 431 (S.D.N.Y. 2008) ("'or' is [a] disjunctive particle used to express an alternative or to give a choice of one among two or more things" (internal citation and quotation marks omitted)); 11 Richard A. Lord, *Williston on Contracts* § 30:12 (4th ed. 2008) ("It has been said that the words 'and' and 'or' should not be considered interchangeable in construing a contract, absent strong supporting reasons."). By contrast, the Improper Conduct Exclusion requires a final adjudication establishing "deliberately fraudulent conduct."

Judge Liman was well within his power to find that McDevitt engaged in "fraud" under Recourse Event (a). But he chose not to do so, presumably because the facts did not support such a finding. Instead, he found that in failing to disclose the threatened and pending Porter Wright litigation, "McDevitt made willful and intentional misrepresentations or omissions of material fact[.]" (Summary Judgment Decision 36). Finding that McDevitt made intentional or willful material misrepresentations or omissions was sufficient to trigger Recourse Event (a), given the disjunctive use of "or" in the guaranty. Entirely absent from the Summary Judgment Decision, however, are the words "fraud," "fraudulent," or "fraudulently." To suggest that the Summary Judgment Decision nonetheless establishes that McDevitt committed a deliberately fraudulent act or omission implicating the Improper Conduct Exclusion is to ignore Judge Liman's intentional choice to find that McDevitt made willful and intentional misrepresentations of material fact, but did not

necessarily engage in fraud.  This Court will not make that finding by
implication.

There is nothing in the Improper Conduct Exclusion to suggest that its
use of "deliberately fraudulent" should be understood in a manner different
than or at odds with use of the word "fraud" in Recourse Event (a), which
Judge Liman did not find.  Moreover, the very dictionary on which Defendants
principally rely — Black's Law Dictionary — does not define the terms "fraud,"
"fraudulent act," or "misrepresentation" synonymously.  *See Misrepresentation*,
*Black's Law Dictionary* (11th ed. 2019) ("The act or an instance of making a
false or misleading assertion about something, usually with the intent to
deceive."); *Fraud, Black's Law Dictionary* (11th ed. 2019) ("A knowing
misrepresentation or knowing concealment of a material fact made to induce
another to act to his or her detriment."); *Fraudulent Act, Black's Law Dictionary*
(11th ed. 2019) (either "[c]onduct involving bad faith, dishonesty, a lack of
integrity, or moral turpitude" or "[c]onduct satisfying the elements of a claim for
actual or constructive fraud").  Thus, Defendants' argument boils down to the
Summary Judgment Decision establishing by implication that McDevitt
engaged in deliberately fraudulent conduct.  To accept that argument, the
Court must infer that findings of willful and intentional misrepresentations are
findings of fraud — despite their differing definitions — and that Judge Liman
functionally found both fraud and intentional misrepresentations sufficient to
trigger the guaranty — despite the guaranty giving him the option to find one

33

or the other.  Neither of these inferences comports with principles of insurance interpretation.  *See, e.g., Sheldon*, 186 B.R. at 369.

Finally, Defendants point only to the first definition of "fraudulent act" in Black's Law Dictionary, and disregard the other definition listed thereafter, "actual or constructive fraud."  Under New York law, proving actual or constructive fraud requires proof of several elements beyond a material misrepresentation or omission of fact, including proof of scienter, none of which was discussed in or established by the Summary Judgment Decision.[17] Nor were these findings necessary to that decision.  Courts interpreting similar exclusionary clauses in insurance policies have strictly required the relevant final adjudication to establish the elements of fraud as understood in the law, not simply dictionary definitions tangential to the meaning of fraud.  *See, e.g., Rochester Drug Co-Operative, Inc.* v. *Hiscox Ins. Co., Inc.*, 466 F. Supp. 3d 337, 355 (W.D.N.Y. 2020) (rejecting argument that final adjudication established a "deliberate criminal or deliberate fraudulent act" because relevant stipulation "does not allege any cause of action rooted in deliberate criminal or fraudulent acts, but instead alleges a claim for failure to report suspicious orders"); *Davis* v. *Home Ins. Co.*, No. 95 Civ. 94 (LMM), 1995 WL 380133, at *2 (S.D.N.Y. June 26, 1995) (finding insurer had no duty to defend because policy excluded

---

[17]   "Under New York law, there are five elements of fraud: '[i] a material misrepresentation or omission of fact, [ii] made with knowledge of its falsity, [iii] with an intent to defraud, and [iv] reasonable reliance on the part of the plaintiff, [v] that causes damage to the plaintiff.'"  *Tutor Perini Bldg. Corp.* v. *New York City Reg'l Ctr., LLC*, 525 F. Supp. 3d 482, 515 (S.D.N.Y. 2021) (quoting *Schlaifer Nance & Co.* v. *Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)).  To prove constructive fraud, a plaintiff must prove the same elements, except that scienter is replaced by a fiduciary or confidential relationship among the parties.  *Id.*

coverage for "any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, maliciously or deliberately wrongful acts or omissions committed by the Insured," and "[t]he acts with which [the insured] is charged all require the Government to prove an element of intent or deliberate wrongfulness").

### b. The Summary Judgment Decision Does Not Establish That McDevitt Obtained an Improper Advantage

Next, Defendants turn to the Improper Advantage Exclusion.  This exclusion bars coverage for any claim against the insured

> based upon, arising out of, or attributable to such Insured gaining in fact any profit, remuneration or financial advantage to which such Insured was not legally entitled if a final adjudication in such Claim establishes that such profit, remuneration or financial advantage occurred[.]

(Policy, Directors, Officers and Company Liability Coverage Part § IV.A.7). Defendants piece together certain of Judge Liman's findings to argue that the Summary Judgment Decision established that McDevitt obtained "profit, remuneration or financial advantage to which [he] was not legally entitled." Because, it is argued, the Summary Judgment Decision (i) detailed Sensei's difficult financial position; (ii) discussed that McDevitt obtained a $100,000 loan; and (iii) established that McDevitt made misrepresentations and omissions in connection with the note transaction, Defendants claim that it necessarily follows that the Summary Judgment Decision established that McDevitt obtained an improper financial advantage to which he was not

entitled.  As with their other exclusion arguments premised on the Summary Judgment Decision, Defendants are incorrect.

To begin, it is unclear why benefits to Sensei under the note should be attributed to McDevitt such that McDevitt, rather than Sensei, would be deemed to have received an improper financial advantage.  (Def. Br. 16). Sensei received the direct benefits under the note, insofar as KLS agreed to purchase the note from Sensei, not McDevitt.  (Summary Judgment Decision 3).  Moreover, while the Summary Judgment Decision details Sensei's precarious financial condition and why Sensei may have been motivated to transact with KLS (*id.* at 2), the Court sees no reason to attribute those facts to McDevitt.  To the extent that the Summary Judgment Decision simply quotes the guaranty for the proposition that McDevitt would "obtain substantial direct and indirect benefits from the issuance of the Note" (*id.* at 8), the Decision does not "establish" such fact by a "final adjudication," for the reasons detailed earlier.  Further, the Summary Judgment Decision hardly mentions that a $100,000 loan was potentially made to McDevitt, other than the fact that the loan was listed in a disclosure schedule.  (*Id.* at 42).[18]  Defendants simply seek to play up how the loan to McDevitt featured into the Summary Judgment Decision by citing to the underlying documents themselves — like the note purchase agreement or the guaranty — rather than Judge Liman's findings. (*See* Def. Br. 16).

---

[18]    Indeed, Sensei was authorized to use proceeds from sale of the note to loan $100,000 to McDevitt. (Compl., Ex. 11 at 57).  But Defendants do not even establish that the loan was ever made to McDevitt, just that Sensei was authorized to make it.  (Summary Judgment Decision 42).

At a more basic level, nothing in the Summary Judgment Decision maps onto the language of the Improper Advantage Exclusion. Judge Liman never discussed McDevitt obtaining a benefit to which he was not legally entitled, and certainly did not make a finding on this point. Defendants' lack of citations to the Summary Judgment Opinion is telling. (Pl. Br. 22). *See, e.g.*, *Bistricer* v. *Fed. Ins. Co.*, No. 02 Civ. 5366 (JSR), 2003 WL 22251290, at *4 (S.D.N.Y. Sept. 30, 2003) (interpreting similar exclusion, and noting that "[s]ince neither dishonesty nor personal profit are elements of the alleged negligence, plaintiffs would be entitled to coverage with respect to this claim, along with concomitant defense, if all other prerequisites were met").[19]

Nor does the Summary Judgment Decision address or establish that the note transaction was void *ab initio*. Judge Liman did not determine that the note, the guaranty, or any other related contract documents were voided due to McDevitt's conduct. Quite the contrary: Judge Liman found that the note was *breached* and that the triggering of the Recourse Events in the guaranty made McDevitt personally liable for the breach. (*See, e.g.*, Summary Judgment Decision 44 ("McDevitt guaranteed that, if he caused Sensei to materially breach a material term of the Note …, he would pay any remaining obligations of Sensei set forth in the Note[.]")). Indeed, a contract that is void *ab initio* is a "nullity" — in other words, it is not a contract at all. *Hetchkop* v. *Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d Cir. 1997) (internal citations and

---

[19]     Defendants correctly note that the Improper Advantage Exclusion does not require "personal" profit or the like. (Def. Reply 17).

quotation marks omitted).  Thus, arguing that a contract is void *ab initio* is a defense to liability for a breach, because a promisor does not owe any obligations under a void contract.  *Id.* (collecting cases discussing a contract being void *ab initio* as a defense to breach or enforcement).  But KLS was seeking to enforce the note and the guaranty, not to find them void and thus to vitiate McDevitt's obligation to repay.  (Summary Judgment Decision 44 (noting that KLS was permitted to accelerate the note's repayment — including all principal and unpaid interest — due to the triggering of Recourse Events and breaches of the note)).  *See Hetchkop*, 116 F.3d at 32 (stating that a contract that is void *ab initio* "is based on a promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor" (internal citation and quotation marks omitted)).  That the Summary Judgment Decision established breaches of the note and the guaranty — in part based on misrepresentations by McDevitt — simply does not establish that those agreements were void *ab initio*.

Once again, Defendants' argument relies on rhetorical alchemy — efforts to transmute Judge Liman's orthogonally related findings into exclusions under the Policy.  A finding that the transaction was void *ab initio* was not necessary to the breach of guaranty finding, and such a finding was not made.  Moreover, Judge Liman never suggested that the note and guaranty were void; indeed, the Summary Judgment Decision never uses the word "void."  Likewise, Defendants' theory that this Court can ascertain from Judge Liman's findings that the note and its associated agreements were somehow void (and thus that

McDevitt obtained a financial advantage to which he was not legally entitled) also fails because the Summary Judgment Decision did not establish that McDevitt fraudulently induced KLS to enter into the transaction.[20]  *See supra* Section B.2.a.  Again, the Summary Judgment Decision does not address fraud (or establish any other elements of fraudulent inducement).  *Id.*  To suggest that a final adjudication thus established these points is to again draw out far too many inferences from the Summary Judgment Decision, and to vastly expand by implication the Policy's exclusions.

In any event, Defendants have offered no authority to substantiate their theory that gains obtained via a voided contract due to fraud would constitute a financial advantage to which McDevitt was not legally entitled as understood in the Policy.  Nor do they offer any authority that a breach of contract constitutes a "financial advantage [or profit] to which [an] [i]nsured [is] not legally entitled."  Though the Improper Advantage Exclusion is surely broader than Plaintiff suggests (*see* Pl. Br. 24 (arguing that the "benefit must be direct and unlawful, like larceny")), Sensei and McDevitt were legally entitled to the benefits of their bargain: they just did not fulfill their end of it.  *Cf. Am. Century Servs. Corp.* v. *Am. Int'l Specialty Lines Ins. Co.*, No. 01 Civ. 8847 (GEL), 2002

---

[20]    "Under New York law, the elements of a claim for fraudulent inducement are: [i] [the] defendant knowingly made a misrepresentation of a material fact; [ii] with the intent to deceive another party and induce that party to act on it; [iii] [the] plaintiff reasonably relied upon the representation; and [iv] as a result of such reliance plaintiff suffered damage."  *Kriegel* v. *Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000, at *10 (S.D.N.Y. June 30, 2014) (citing *Universal Antiques, Inc.* v. *Vareika*, 826 F. Supp. 2d 595, 607 (S.D.N.Y. 2011); *GoSmile, Inc.* v. *Levine*, 915 N.Y.S.2d 521, 524 (1st Dep't 2010)).  "Fraudulent inducement involves 'a misrepresentation [or omission] of present fact, not of future intent, collateral to a contract' and used to induce the defrauded party to sign the contract."  *Bruce* v. *Martin*, No. 87 Civ. 7737 (RWS), 1993 WL 148904, at *5 (S.D.N.Y. Apr. 30, 1993) (internal citations omitted).

WL 1879947, at *8 (S.D.N.Y. Aug. 14, 2002) (noting that similar exclusion would preclude coverage for patent infringement case for "recovery of the fair market value of intellectual property [the insured] used without payment in the course of its business, which it should have to disgorge as an illegal benefit or advantage it gained by appropriation").

**c.    The Summary Judgment Decision Does Not Establish That McDevitt Engaged in a Willful Violation of Law**

As with the Second Circuit Decision, the Summary Judgment Decision does not establish that the claim is "based upon, arising out of, or attributable to ... any willful violation of law[.]" (Policy, Directors, Officers and Company Liability Coverage Part § IV.A.6). The Court will not rehash its analysis as to what the Summary Judgment Decision established on this point, because both it and the Second Circuit Decision are consistent in their discussions of Sensei's tax-related breach. The Summary Judgment Decision did not address tax law, willful violations of law, or violations of law more broadly. It did not find a violation of a specific statute of law, let alone a "willful" one. (Summary Judgment Decision 51 (noting that Recourse Event (c) does not require a finding of willfulness or intent)). And it did not establish that any violations of law, if so established, are attributable to McDevitt, as opposed to Sensei. *See supra* n.15. That Judge Liman discussed actions McDevitt took in relation to Sensei's tax situation — including his "strategy" connected to the offer in compromise — does not mean that the Summary Judgment Decision established a willful violation of law. (Summary Judgment Decision 57). McDevitt merely raised certain arguments in defense of a finding of breach that

40

Judge Liman rejected because the "failure timely to file and pay [taxes] was material." (*Id.*).

### 3. The Prior Litigation Exclusion Is Not Applicable

As a final refuge, Defendants turn to the "Prior Litigation Exclusion" in the Policy. To review, this exclusion excludes coverage for any claim

> based upon, arising out of, or attributable to any written demand or proceeding against any Insured which was made or pending on or before the applicable Prior Litigation Date set forth in the Coverage Schedule in Item IV(B) of the Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein[.]

(Policy, Directors, Officers and Company Liability Coverage Part § IV.A.2). Unlike the other exclusions, the Prior Litigation Exclusion is not tied to a final adjudication. (*Id.*). Defendants contend that this exclusion bars coverage because the Policy claim is "based upon, aris[es] out of, or [is] attributable to" the Porter Wright and Schwartz demands, which were made before the June 7, 2018 prior litigation cut-off date. (*Id.*; Def. Reply 18-19).

Defendants' argument is creative, but unavailing. The Policy is a claims-made insurance policy. (Policy, Directors, Officers and Company Liability Coverage Part § I.A (noting that coverage pertains to "any Claim first made against the Insured Person during the Policy Period")). Unlike the coverage afforded by an "occurrence" policy, "[a] pure claims-made policy provides coverage for claims made during the policy period regardless of when the events out of which the claim arose occurred." 7 Jordan R. Plitt, Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, *Couch on Insurance* § 102:22 (3d ed.

41

2022).  "The purpose of [a] prior litigation exclusion provision is so that insurance companies can be apprised of events that might blossom into a covered event during the policy period." *Zahoruiko* v. *Fed. Ins. Co.*, No. 15 Civ. 474 (VLB), 2017 WL 776645, at *5 (D. Conn. Feb. 28, 2017) (internal quotation marks and citation omitted) (applying Connecticut law), *aff'd*, 717 F. App'x 50 (2d Cir. 2018) (summary order).  Claims-made policies thus incorporate prior litigation exclusions in order to prevent an "an insured [from] recover[ing] for claims arising from the same facts, circumstances, situations, transactions, events or wrongful acts alleged in a pending lawsuit or made the subject of a prior notice given to another insurer," as such circumstance "would be to grant the insured more coverage than he bargained for and paid for, and [would] require the insurer to provide coverage for risks not assumed." *Id.* (internal quotation marks and citations omitted).

In interpreting analogous prior litigation exclusions, courts have "focused on whether there was a sufficient factual nexus between the two lawsuits." *Pereira* v. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 04 Civ. 1134 (LTS), 2006 WL 1982789, at *4 (S.D.N.Y. July 12, 2006) (internal quotation marks and citations omitted).  Accordingly, in order to be excluded by the Prior Litigation Exclusion, the *claim* made here based on the KLS Action must be "based upon, aris[e] out of, or [be] attributable to" the Porter Wright and Schwartz demands.  But that simply is not the case.  While the *facts* of those demands and litigations are relevant to the claim made for the KLS Action, the KLS Action concerns breach of an entirely separate guaranty.  Thus, those

42

demands are only relevant insofar as they translated into consequences under the guaranty and note documents; the KLS Action did not actually concern those demands, other than the fact that they gave rise to certain Recourse Events and breaches.

Unsurprisingly, Defendants do not cite a single case interpreting a prior litigation exclusion as broadly as they wish.  (*See* Def. Reply 18-20; Def. Br. 17).  Indeed, in their opening brief, Defendants devote just one paragraph to arguing that the Prior Litigation Exclusion bars coverage for the instant claim.  (Def. Br. 17).  The Court understands Defendants' argument, but concludes that it runs contrary to the purpose of a prior litigation exclusion, which is to prevent double recovery on what is in essence the same claim made against two different insurance policies.  *See, e.g.*, *Zunenshine* v. *Exec. Risk Indem., Inc.*, No. 97 Civ. 5525 (MBM), 1998 WL 483475, at *5 (S.D.N.Y. Aug. 17, 1998) (collecting cases), *aff'd*, 182 F.3d 902 (2d Cir. 1999).  Courts in this Circuit have found that a prior litigation exclusion bars coverage where a second litigation brought by shareholders alleged the same factual bases as a prior securities litigation brought by noteholders, *Zunenshine*, 1998 WL 483475, at *5; where a subsequent demand letter alleged identical securities violations to prior arbitrations, *Quanta Lines Ins. Co.* v. *Invs. Cap. Corp.*, No. 06 Civ. 4624 (PKL), 2009 WL 4884096, at *13 (S.D.N.Y. Dec. 17, 2009), *aff'd sub nom. Quanta Specialty Lines Ins. Co.* v. *Invs. Cap. Corp.*, 403 F. App'x 530 (2d Cir. 2010) (summary order); and where a subsequent lawsuit was premised on the same breach of fiduciary duty claims brought in a prior lawsuit, *Pereira* v.

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 525 F. Supp. 2d 370, 378 (S.D.N.Y. 2007) (comparing claims brought in first lawsuit to those in subsequent lawsuit), *aff'd sub nom. Pereira* v. *Gulf Ins. Co.*, 330 F. App'x 5 (2d Cir. 2009) (summary order).  Here, there is no such concern over double recovery; the KLS Action did not pertain to the facts, circumstances, or legal claims of the Porter Wright and Schwartz demands, and turned solely on the *fact* that those demands were made and not disclosed in conjunction with the note and guaranty.[21]  The quintessential example of the Prior Litigation Exclusion here coming into effect would be coverage for the Porter Wright and Schwartz litigations, not breach of the note and guaranty.  (Pl. Br. 25 ("To the extent such litigation exists and is the basis for the Claim, and to the extent that such prior claim is not the subject of separate coverage under a different iteration of the Policy, the Insured cannot manufacture coverage by the re-imposition of the Claim dressed up as something else.")).

Defendants effectively concede that they lucked out by the Prior Litigation Exclusion referring to "demands" and the KLS Action being premised, in part, on non-disclosed demands.  (Def. Reply 19 n.14).  But beyond simply parsing dictionary definitions and boilerplate recitations of law (*id.* at 19 (noting that the phrase "arising out of" has a broadly recognized meaning)),

---

[21]     To the extent that Defendants argue that they are simply appealing to the first clause of the exclusion, that the claim is "based upon or arise[s] out of or [is] attributable to any written demand or proceeding" made prior to June 7, 2018, *Quanta Lines Insurance Company* v. *Investors Capital Corporation* analyzed a similar prior litigation exclusion and undertook to determine whether the prior arbitrations "involve[d] the allegations in the [demand] letter."  No. 06 Civ. 4624 (PKL), 2009 WL 4884096, at *21 (S.D.N.Y. Dec. 17, 2009).

Defendants do not seriously contend that their proffered application of the Prior Litigation Exclusion comports with the understanding of a reasonable insured.  *Cf. Pereira* v. *Gulf Ins. Co.*, 330 F. App'x 5, 6 (2d Cir. 2009) (summary order) ("Nor do we agree that the district court's interpretation of the prior litigation exclusion renders that clause so broad as to be meaningless or to defeat the parties' intentions.").  The Court will not eschew common sense and the parties' understanding of the Prior Litigation Exclusion to bar coverage here.

Finally, Defendants do not address the fact that, even if the Prior Litigation Exclusion somehow came into effect here, the KLS Action was premised on more than the Porter Wright and Schwartz demands.  (*See* Pl. Br. 27 (noting that the Second Circuit "did not reach the failures to disclose threatened and pending litigations")).  Indeed, both Judge Liman's and the Second Circuit's decisions offered an entirely separate and adequate ground for breach of guaranty: the failure to pay taxes.  Defendants offer no authority to argue that simply because the Porter Wright and Schwartz demands were made and triggered certain Recourse Events, coverage would be barred as to other Recourse Events.  Thus, even if the Court were to accept Defendants' interpretation as correct, it still would not find that the Prior Litigation Exclusion bars coverage.

### 4.   The Court Does Not Find That Plaintiff Has Shown Bad Faith[22]

Plaintiff is not satisfied with a recovery of the remaining Policy limits. Rather, Plaintiff asks the Court to find that Defendants acted in bad faith by failing to settle the claim within policy limits, and thus are liable for the entire judgment amount.  (Pl. Br. 27-28).  Because Defendants failed to settle with Plaintiff within limits following the two underlying decisions, Plaintiff argues that Defendants have exposed their insured to an above-limits judgment and must pay the entire amount of the judgment.  (*Id.*).  Plaintiff is incorrect.

"New York law does not recognize an independent cause of action for bad faith denial of insurance coverage."  *Vitrano* v. *State Farm Ins. Co.*, No. 08 Civ. 103 (JGK), 2008 WL 2696156, at *3 (S.D.N.Y. July 8, 2008).  That said, "insurers owe a duty to those they insure 'to act in good faith when deciding whether to settle' a claim."  *Scottsdale Ins. Co.* v. *Indian Harbor Ins. Co.*, 994 F. Supp. 2d 438, 450 (S.D.N.Y. 2014) (quoting *Pinto* v. *Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000) (internal quotation marks omitted)).  To establish bad faith in this context, an insured must show that the insurer acted "in a way that displayed 'conscious or knowing indifference to the probability that an

---

[22]   Though the Complaint does not explicitly contain a bad faith claim, Plaintiff devotes a multitude of paragraphs to allegations of bad faith.  (Compl. ¶¶ 79-92).  The requested relief is also above-limits.  (*Id.* ¶ 95).  To be sure, Plaintiff could have explicitly included a claim for bad faith in addition to breach of contract, but Plaintiff's pleading easily puts Defendants on notice of the claim sufficient to comply with Rule 8.  Fed. R. Civ. P. 8(a)(2-3) (requiring a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought, which may include relief in the alternative or different types of relief"); *see also Neri* v. *Coughlin*, No. 92 Civ. 7890 (SS), 1993 WL 464687, at *7 (S.D.N.Y. Nov. 9, 1993) ("[S]ince an issue presented for the first time in a motion for summary judgment may be considered and treated as an amendment of the complaint, and since defendants received notice of this claim and responded to it in their reply memorandum of law in support of their motion for summary judgment, I will address the issue.").  In point of fact, Defendants' answer responds to the bad faith allegations in this case.  (Dkt. #19).

insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted.'" *Perkins* v. *Am. Transit Ins. Co.*, No. 10 Civ. 5655 (CM) (RLE), 2011 WL 5051739, at *2 (S.D.N.Y. Oct. 24, 2011) (quoting *Pavia* v. *State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445, 453-54 (1993)) (alterations omitted).

Plaintiff's arguments for why it is entitled to an above-limits recovery here entirely miss the mark. Plaintiff points to a few instances where, after having obtained the assignment of McDevitt's rights under the Policy and KLS's judgment, Plaintiff attempted to reach a within-limits settlement with Defendants. (Pl. Br. 28-29). Plaintiff thrice reached out to Defendants — twice in June 2022 after the Summary Judgment Decision but before the Second Circuit Decision, and once in August 2022 after the Second Circuit Decision. (Licker Aff., Ex. 1-3).[23] Defendants twice rejected Plaintiff's offer of a within-limits settlement. (*Id.*). To the extent Plaintiff attempts to dress these allegations up in language pertaining to the situation where an insurer fails to settle a claim, their attempt is either misplaced or disingenuous. Ultimately, Plaintiff does not suggest that Defendants acted in bad faith by failing to settle the KLS Action within the Policy's limits while the litigation was ongoing and before the Summary Judgment Decision was rendered, thus subjecting McDevitt to an above-limits judgment. Indeed, by the time Plaintiff even

---

[23]    It should be noted that Plaintiff's exhibits to the Licker Affidavit do not appear to line up perfectly with the Affidavit's description of the exhibits. For example, the Affidavit purports to include both a June 17, 2022 letter pertaining to settlement negotiations and a June 27, 2022 email pertaining to the same, but the latter exhibit is not included. (Licker Aff. ¶¶ 3-4).

reached out with a settlement offer, the Summary Judgment Decision had been rendered and the appeal was about to be decided. *Cf. Pavia*, 82 N.Y.2d at 454 (noting that prior to trial, "[b]ad faith is established only where the liability is clear and the potential recovery far exceeds the insurance coverage" (internal citations and quotation marks omitted)).

Instead, Plaintiff merely parrots language in the caselaw pertaining to pre-trial settlement demands to argue that Defendants acted in bad faith by effectively denying coverage (or in Plaintiff's words, failing to "settle") following the Summary Judgment Decision, and later the Second Circuit Decision, as McDevitt's assignee and holder of the judgment.  The duty of good faith with respect to settlement of a claim exists "[b]ecause an insurance company has exclusive control over a claim against its insured once it assumes defense of the suit[.]" *Pinto*, 221 F.3d at 398.  That concern does not exist here.  Plaintiff is not contending that Defendants failed to settle the *underlying* KLS Action with KLS while it was ongoing for a within-limits amount; rather, Plaintiff is simply protesting that Defendants effectively denied coverage after the Summary Judgment Decision, after the assignment of all relevant rights, and while the approximately $5.5 million judgment existed due to the Summary Judgment Decision.  (Pl. Br. 29).  *See New England Ins. Co.* v. *Healthcare Underwriters Mut. Ins. Co.*, 295 F.3d 232, 241 (2d Cir. 2002) (discussing the "gross disregard" standard for assessing bad faith refusal to settle a claim before trial or other dispositive outcomes).  In other words, Plaintiff's bad faith claim is duplicative of its breach of contract claim.  (Def. Reply 22).  *See, e.g.*,

*Sikarevich Fam. L.P.* v. *Nationwide Mut. Ins. Co.*, 30 F. Supp. 3d 166, 170
(E.D.N.Y. 2014) ("New York courts do not recognize a separate cause of action
for breach of the implied covenant of good faith and fair dealing when a breach
of contract claim, based upon the same facts, is also pled, and the latter claim
should be dismissed as redundant." (internal quotation marks and citations
omitted)).

Though the facts may appear unusual — with Plaintiff assigned both the
judgment and the rights under the Policy — Plaintiff does not identify
actionable "bad faith" under New York law.  At the time Plaintiff was attempting
to "settle" the claim, it was effectively negotiating against itself by demanding
coverage on behalf of McDevitt on the one hand, and noting that the judgment
*it owned* exceeded the remaining limits on the other.  (Licker Aff., Ex. 1).  And
all of this occurred after the Summary Judgment Decision.  This is not what
the good faith doctrine is meant to protect.  Indeed, in the ordinary case
implicating the good faith doctrine, the underlying plaintiff (KLS) and
underlying defendant (McDevitt) would negotiate a settlement for a claim.  If
the insurer, on the hook for possible indemnity and defending the claim,
unreasonably denies the settlement and subjects the underlying defendant to
an above-limits judgment, there may then be good reason to hold it liable for
the judgment amount.  *See, e.g.*, *Greenidge* v. *Allstate Ins. Co.*, 312 F. Supp. 2d
430, 439 (S.D.N.Y. 2004) ("In conducting settlement negotiations *on behalf of
an insured*, an insurer engages in two different analyses, each of which is
subject to the test of good faith." (emphasis added)), *aff'd*, 446 F.3d 356 (2d

Cir. 2006).  Here, Plaintiff, standing in the shoes of KLS, did not offer a settlement to McDevitt prior to the Summary Judgment Decision, which Defendants denied; rather, Plaintiff, standing in the shoes of McDevitt *and* KLS, demanded coverage directly from Defendants while noting it would deem the judgment as to McDevitt satisfied.  (Licker Aff., Ex. 1).  There is an inherent conflict of interest in Plaintiff playing both sides as assignee of the judgment and the rights under the Policy at the time Plaintiff made its demands.[24]  The Court sees no reason to condone Plaintiff effectively using the judgment as leverage to obtain insurance coverage to which it claims, acting on behalf of McDevitt, it was clearly due.[25]

Even if this claim were cognizable, Plaintiff has not even argued its *sine qua non*: that Defendants in fact acted with bad faith.  While Plaintiff's papers recite that an insurer can be liable in excess of limits if it acts in bad faith and

---

[24]   To be clear, these types of bad faith actions often arise following an assignment of the claim to the underlying plaintiff — like here — because "the only way for the plaintiff to recover is by pursuing a bad-faith action against the insurer pursuant to an assignment by the insured." *Gov't Emps. Ins. Co.* v. *Saco*, No. 12 Civ. 5633 (NGG) (ST), 2018 WL 6531608, at *5 (E.D.N.Y. Dec. 11, 2018).  But the events relevant to the bad faith claim still transpire prior to the assignment.  Otherwise, an underlying plaintiff could always transform a breach of policy claim into a bad faith claim by obtaining an assignment, *then* making a settlement demand.

[25]   This result would be the same under Delaware law.  Though Delaware "recognize[s] that an insured has a cause of action for breach of the implied covenant of good faith when the insurer refuses to honor its obligations under the policy[,]" the insurer must "clearly lack[] reasonable justification for doing so." *Enrique* v. *State Farm Mut. Auto. Ins. Co.*, 142 A.3d 506, 511 (Del. 2016).  Thus, like New York law, "the implied covenant has historically included a duty to settle [claims] within policy limits where recovery in excess of those limits is substantially likely." *Connelly* v. *State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1274 (Del. 2016) (internal quotation marks omitted).  The cases that Plaintiff cites to all concern pre-trial failures by the insurer to settle a claim with an underlying plaintiff, thus subjecting the insured to an above-limits judgment.  *Id.* at 1273 (failure to settle pre-judgment for thirty-five percent of policy limits); *McNally* v. *Nationwide Ins. Co.*, 815 F.2d 254, 259 (3d Cir. 1987) ("The insurer is liable if it fail[ed] to use good faith or due care in settlement negotiations with [underlying] plaintiff *prior to trial.*" (internal citation and quotation marks omitted) (emphasis added)).

detail a few post-Summary Judgment Decision settlement offers, Plaintiff only gestures at an argument that Defendants "engaged in a pattern of behavior evincing a conscious or knowing indifference to the probability that an insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted." *Pavia*, 82 N.Y.2d at 454.  This Court has reviewed Plaintiff's settlement correspondence with Defendants, and cannot identify any bad faith.  (Licker Aff., Ex. 1-3).  *See Fed. Ins. Co.* v. *N. Am. Specialty Ins. Co.*, 921 N.Y.S.2d 28, 30 (1st Dep't 2011) (finding issues of material fact as to bad faith claim because such inquiry is subject to a "stringent," fact-intensive determination).  There is nothing unreasonable — or indicative of a knowing indifference to the insured — about waiting a few months after Plaintiff's initial demand for the Second Circuit to render its decision in a complicated underlying case.

To the extent Plaintiff's bad faith claim — which is really a breach of Policy claim — is reasonably understood as a claim for consequential damages, "[t]here is 'a very strong presumption against bad faith liability' on the part of an insurer" that "'can be rebutted only by evidence establishing that the insurer's refusal' to provide coverage 'was based on more than an arguable difference of opinion and exhibited a gross disregard for its policy obligations.'" *99 Wall Dev., Inc.* v. *Allied World Specialty Ins. Co.*, No. 18 Civ. 126 (RA), 2021 WL 4460638, at *11 (S.D.N.Y. Sept. 29, 2021) (quoting *Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*, 252 F.3d 608, 624-25 (2d Cir. 2001)).  As evidenced by this

Opinion, the interpretation of the Policy, the Summary Judgment Decision, *and* the Second Circuit Decision are all subject to reasonable disagreement.[26]

## CONCLUSION

As noted in this Opinion, Defendants have not contested that coverage exists under the Policy unless the above-discussed exclusions apply. Having found that the exclusions are not applicable, the Court GRANTS IN PART and DENIES IN PART Plaintiff's motion for summary judgment, and DENIES Defendants' motion for judgment on the pleadings. Specifically, the Court finds that Plaintiff has shown that there are no disputes of material fact that coverage exists under the Policy and that no exclusions apply, but finds that Plaintiff has not demonstrated bad faith such that Plaintiff is entitled to relief above the remaining Policy limits. Ordinarily, the Court would enter judgment in a case such as this one, finding that Plaintiff is entitled to coverage equal to the remaining Policy limits and that no exclusions apply. However, because Defendants did not move for judgment on the pleadings with respect to Plaintiff's bad faith allegations or cross-move for summary judgment on the bad faith claim, the parties are **ORDERED** to submit a joint letter by **May 19, 2023**, discussing whether any steps remain in this case.

---

[26]     Plaintiff also contends that correspondence during and after the KLS Action, including with McDevitt, Sensei, and Liberty, is "further evidence [of Liberty's] bad faith." (Pl. Br. 29 n.17). Plaintiff does not explain why this would be the case, especially given the various players involved.

The Clerk of Court is directed to terminate the pending motions at docket entries 28 and 35.

SO ORDERED.

Dated:     May 3, 2023
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge